**UNITED STATES of America, Plaintiff,**

v.

**Larry D. BARNETTE, et al., Defendants.**

**No. 83–Cr–131–J–16.**

United States District Court,
M.D. Florida,
Jacksonville Division.

Aug. 18, 1995.

Edward B. Gaines, Asst. U.S. Attorney, Jacksonville, FL, for plaintiff.

Charles W. Arnold, Jr., Holland & Knight, Jacksonville, FL, for defendants.

## OPINION

JOHN H. MOORE, II, Chief Judge.

This cause is before the Court on the United States' Petition for Civil Contempt filed June 19, 1992 (Doc. # 976) and Supplemental Petition to Adjudicate both Larry and Kathleen Barnette in Civil Contempt filed June 3, 1994 (Doc. # 1063). The United States has also filed, on January 3, 1995, (Doc. # 1077) a Motion for Summary Judgment as to the criminal forfeiture judgment. The Court conducted hearings on the contempt petitions as well as a valuation hearing on May 15, 16, and 31, 1995.[1] The United States submitted proposed findings of fact and conclusions of law on June 21, 1995, and amended proposed findings of fact and conclusions of law on June 23, 1995. Defendant Larry Barnette submitted proposed findings of fact and conclusions of law on June 21, 1995. Upon due consideration of the petitions, the legal premises therein, as well as the evidence offered in support and opposition thereto, the Court finds that the petitions should be granted in part and denied in part.

---

1. Citations to these hearings will be designated as "T" followed by a "1" for the May 15 hearing, a "2" for the May 16 hearing, and a "3" for the May 31 hearing followed by the appropriate page number.

## I. Background Facts

Mr. Barnette was indicted in August of 1983 and found guilty in July of 1984 of various federal offenses including mail fraud, false statements, bribery, income tax evasion, misapplication of government funds, and racketeering.[2] The jury also returned a special verdict of forfeiture of 900 shares of the common stock of Old Dominion Corp., S.A.[3] ("Old Dominion") owned by Mr. Barnette pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. A criminal forfeiture judgment was entered on October 15, 1984 and Mr. Barnette was sentenced on November 2, 1984. As part of this sentence, Mr. Barnette was ordered to pay $7,000,000 in restitution to the United States. On January 10, 1985, Mr. Barnette deposited $7,000,000 into the court's registry.

On August 19, 1983, several days prior to being indicted on August 30, 1983, Mr. Barnette transferred possession of the 900 shares of Old Dominion common stock, which would eventually be ordered forfeited, to his wife Kathleen Barnette and their two children.[4] Notwithstanding this transfer, the Court found on February 7, 1991 that the government's interest in this stock vested on August 3, 1982, the date of the last offense upon which Mr. Barnette was convicted. Accordingly, the Court found that the government's interest in the stock predated that of Mr. Barnette's wife and children, and that in order to carry out the jury's forfeiture verdict, a final determination must be made as to whether the criminal forfeiture has been satisfied.

The current dispute is whether Mr. Barnette has met his burden of demonstrating the satisfaction of the criminal forfeiture judgment of October 15, 1984. The Court's February 7, 1991 Order addressed the issue whether Mr. Barnette's deposit of $7,000,000 into the court's registry satisfied the forfeiture of 900 shares of Old Dominion common stock. In this order, the Court interpreted the trial court's November 17, 1984 order and found that Mr. Barnette's payment of $7,000,000 in restitution and the forfeiture of 900 shares of Old Dominion common stock, as valued on October 15, 1984, were intended by the trial judge to be a credit against each other. This Court's February 7, 1991 Order also ordered Mr. Barnette to "produce to the government all relevant financial information, including the original books and records of Old Dominion and any records of its bank accounts." The Court deferred its determination of whether the restitution payment of $7,000,000 satisfies the criminal forfeiture judgment until a valuation could be conducted and a value assigned to the stock.

Thus, the Court found that the resolution of this issue would require the assignment of fixed values to the restitution and forfeiture. In making this determination, the Court found that the fixed value of the restitution figure was $7,000,000 without accrued interest. However, the fixed value of forfeiture would involve the assessment of the value of Mr. Barnette's 900 shares of Old Dominion common stock as of October 15, 1984, the date of the criminal forfeiture judgment. If the value of the 900 shares is $7,000,000 or less, then the criminal forfeiture would be satisfied. However, if the value of the 900 shares is more than $7,000,000 Mr. Barnette must forfeit the 900 shares, or the difference in value between the 900 shares and the $7,000,000 in restitution, to the government.

Further, the Court found that Mr. Barnette was obligated to satisfy the criminal forfeiture judgment irrespective of Mr. Barnette's August 19, 1983 transfer of the 900 shares to his wife and children on the eve of being indicted. The Court reasoned that under the pre–1984 criminal RICO statute, the government's interest in the 900 shares vested on August 3, 1982, the date of the last offense upon which Mr. Barnette was convicted. Accordingly, the Court found that Mr. Barnette was responsible for satisfying

---

**2.** See *United States v. Barnette*, 800 F.2d 1558 (11th Cir.1986), *cert. denied*, 480 U.S. 935, 107 S.Ct. 1578, 94 L.Ed.2d 769 (1987).

**3.** Formerly known as Old Dominion Insurance Corporation, S.A.

**4.** Although Mr. Barnette and his wife have been estranged since 1983, they were only recently divorced in 1995. (T3 at 17.)

the criminal forfeiture judgment regardless of what he had done with the Old Dominion stock.

Finally, in an attempt to facilitate the valuation of the 900 shares of Old Dominion common stock, the Court entered an order on December 15, 1992 authorizing the United States to "obtain discovery as to the books, records, bank accounts, current assets and transferred assets of Old Dominion. . . ." Since this order, the government has engaged in discovery including interrogatories and multiple depositions of Mr. Barnette but has been wholly unsuccessful in establishing a value for the 900 shares of Old Dominion common stock. Most importantly, however, the criminal forfeiture judgment entered over ten years ago has not yet been enforced.

## II. Discussion

In an effort to resolve this litigation, the Court conducted a series of hearings on May 15, 16, and 31, 1995. At these hearings, the United States attempted to demonstrate that Mr. Barnette, as well as his wife Kathleen Barnette, are in civil contempt for: 1) violating the trial court's October 18, 1983 temporary restraining order, 2) failing to produce Old Dominion records, 3) failing to deposit the 900 shares of Old Dominion common stock into the court's registry pursuant to the Court's February 15, 1995 Order of disgorgement, and 4) evading the terms of the criminal forfeiture judgment. Further, Mr. Barnette attempted to demonstrate to the Court that he has satisfied the criminal forfeiture judgment entered October 15, 1984. The Court will address the valuation issue first since its resolution necessarily impacts any potential remedy for a finding of contempt.

### A. Valuation

In order to determine whether the 900 shares of Old Dominion common stock should be forfeited, the Court must assign a value to the stock as of the date of the criminal forfeiture judgment. If this stock is valued at $7,000,000 or less, Mr. Barnette's restitution payment of $7,000,000 into the court's registry is a complete set-off against the criminal forfeiture judgment. The government argues, in its summary judgment motion, that Mr. Barnette has kept alive the issue of the value of the 900 shares of Old Dominion common stock by misleading the Court on the stock's value. In any event, the government points out that Mr. Barnette argued during a hearing in 1986, on a motion to disburse interest, that the 900 shares of Old Dominion common stock was worth $5,853,000. This figure was calculated by deducting the value of the preferred stock ($2.5 million) from the total value of Old Dominion ($9 million) for a value of 1000 shares of common stock equal to $6.5 million. Consequently, the value of 90%, or 900 shares, was alleged to be $5,853,000. Apparently, these figures were based on the oldest Old Dominion financial report available to Mr. Barnette, which was dated August 31, 1983.

Notwithstanding this figure, the government argues that Mr. Barnette understated the value of the stock by a minimum of approximately $6 million. The government argues that Mr. Barnette claimed $4,672,000 in contingent liabilities as reinsurance entries on the corporate books, but with the exception of $750,000 all of this contingent liability had been terminated. Also, the government argues that Mr. Barnette overstated the value of the preferred stock. Although Mr. Barnette claimed the preferred stock was valued at $2.5 million, the government cites a confidential grand jury document prepared in 1981 which indicates that the preferred stock is valued at $1 million and according to Mr. Barnette's Affidavit, contained as part of the presentence investigation report in 1984, the preferred stock was valued at $520,000. Accordingly, the government argues that Mr. Barnette should be estopped from claiming anything other than a value of $520,000 for the preferred stock.

Finally, the government argues that based upon Mr. Barnette's admissions, the value of the 900 shares of Old Dominion common stock exceeds $7 million. A reading of the February 2, 1993 deposition of Mr. Barnette reveals that the government attempted to get Mr. Barnette to admit the value of the stock was $7,228,987.55. The government also argues that this figure includes a deduction for $3 million in reinsurance entries which it claims are invalid deductions. The govern-

ment states that even Mr. Barnette's own evaluation expert, Richard Kohler, rejected part of these entries as being invalid. Accordingly, the government argues that even based upon Mr. Barnette's calculation, the value of the stock exceeds $7 million and if the invalid deductions are removed, the value would clearly exceed $7 million by several million dollars. The government contends that this "admission" proves that Mr. Barnette cannot demonstrate the satisfaction of the criminal forfeiture judgment.

In further support of this contention, the government states that none of Mr. Barnette's experts have ever provided a valuation under $7 million. Mr. Barnette's tax accountant, James Horne, was identified by Mr. Barnette as an expert on valuation in Mr. Barnette's response to interrogatories, but stated in his own deposition that he was not qualified to render an evaluation opinion. Ironically, Mr. Horne declared in a sworn affidavit several years before the deposition in 1993, (January 10, 1989), that the value of the 900 shares of Old Dominion common stock would not exceed the book value of $7,704,015. However, Mr. Horne proceeded to apply a 25% discount rate and then stated he was not qualified to render any opinion on the stock's value. Finally, the government points out that at the time this figure was calculated in 1989 by Mr. Horne, all of the reinsurance entries used to deflate the value of the stock in Mr. Barnette's deposition had "run their course."

Mr. Barnette retained Mr. Kohler of the Jacksonville firm of McGee & Kohler to perform a valuation of Old Dominion. According to this valuation, the common stock has an "average range of adjusted common stock value as of October 15, 1984 of: $10.458 million." Mr. Kohler then applied a 25% discount rate that adjusted this figure to approximately $7.060 million for 900 shares of common stock. The government, of course, argues that this valuation, which is based solely on information provided by Mr. Barnette, is incorrect as well as deliberately skewed in favor of Mr. Barnette. The Court notes that this figure exceeds $7,000,000; however, Mr. Barnette would later submit to the Court at the May hearings an "updated" figure that is less than $7,000,000.

First, the government argues that Mr. Kohler incorrectly used a fair market value approach which represents a price at which a willing buyer and a willing seller would complete a transaction, both parties having knowledge of the facts at hand and both parties capable and able of completing the transaction. The government argues that this figure is not only deliberately skewed, but that this approach is incorrect when the government's ownership interest is acquired by a forfeiture vested prior to the criminal forfeiture judgment.

Second, the government argues that the application of a 25% discount rate incorrectly factored into the analysis contingencies that in no way are germane to the government's forfeited interest. For instance, this discount included risk factors for owning the net assets and relating to uncertainties in owning the assets such as a number of unknowns in the corporation's future. An example of these "unknowns" is the possibility of having to pay substantial German or American taxes.

Third, the government argues that an investment value, rather than fair market value, is the appropriate method of valuation because it takes into account the specific value of the assets for a particular investor. According to Willamette Management Associates ("WMA"), which was retained by the United States, the fair market value approach is not appropriate in the case of government forfeiture because there is no willing seller. Further, the investment value approach would be more appropriate since there is some dispute about the accuracy of the financial documents. Consequently, the Willamette report concludes that the Kohler valuation is inaccurate.

According to the Willamette report the value of the 900 shares of Old Dominion common stock as of October 15, 1984, is $10,461,840.94. (Govt. Ex. 104 at 14.) This report concludes that the Old Dominion stock could not have been as low as $7 million using any reasonable valuation approach. Finally, the government argues that since this value exceeds the $7 million already

deposited into the court's registry, it is entitled to all assets of Old Dominion regardless of their value, including transferred assets, because the government is not required to prove, nor is the trial court required to resolve, complex computations so as to ensure a convicted racketeer is not deprived of a single farthing more than his criminal act produced.

In support of the argument that it does not have to demonstrate an exact value of the stock, the government cites to *United States v. Acosta,* 881 F.2d 1039 (11th Cir.1989). In *Acosta,* the Eleventh Circuit reversed a jury determination of forfeiture upon a finding of plain error. *Id.* at 1041. Upon conviction, the jury found that the defendant's criminal activity generated $6 million and that with some of this money he had acquired two parcels of real property, a boat, and several certificates of deposit. *Id.* at 1040. The court found that the jury committed plain error in finding that the defendant had acquired $6 million *in addition to* the items he purchased with some of this money. *Id.* Accordingly, the court stated that although "RICO does not require the prosecution to prove or the trial court to resolve complex computations, so as to ensure that a convicted racketeer is not deprived of a single farthing more than his criminal act produced," there was no evidentiary support for the amount of the verdict exceeding $6 million. *Id.* Thus, the court remanded the case to the district court to adjust the forfeiture judgment by reducing the $6 million figure by the amount of the items the defendant purchased with his racketeering proceeds. *Id.*

In response to the government's summary judgment motion, Mr. Barnette argues that there are clear factual disputes regarding the value of the stock. For instance, Mr. Barnette notes that: 1) the government indicates that Mr. Barnette himself valued the stock at $6,917,246.71 in his deposition, 2) Mr. Horne swore that the value of the stock would not exceed its book value of $7,704,015.00, and 3) Mr. Kohler provided a report on the value being $7,060,000.00. In reply, the government argues in turn, that: 1) Mr. Barnette's deposition testimony does not preclude summary judgment because the Kohler report impeaches Mr. Barnette's valuation, 2) Mr. Horne admits that he is not competent to render a valuation, and 3) the government reiterates that the Kohler report is incorrect as a matter of law.

The Court finds that the parties' arguments in support and opposition to the government's summary judgment motion are illuminating and helpful in putting this issue into context. However, based upon the evidence submitted at the May hearings, the Court finds that the value of the 900 shares of Old Dominion common stock on October 15, 1984 is clearly greater than $7,000,000. In support of this determination, the Court notes that it is not persuaded by Mr. Barnette's valuation. During the May hearings, Mr. Barnette submitted the Kohler report with a corresponding valuation chart. (Def.'s Ex. 11 & 15.) The Kohler report, created May 24, 1993, indicated that the 900 shares had an estimated fair market value of $7,059,247.56 on October 15, 1984. (Def.'s Ex. 15 at 6; T2 at 148–51.) However, at the May hearings, Mr. Barnette produced the Kohler chart, created May 12, 1995, which provides that the fair market value of the 900 shares of Old Dominion common stock was $6,426,935.06 on October 15, 1984. (Def.'s Ex. 11.) Mr. Kohler testified that the difference between the Kohler report and the Kohler chart (i.e., $7,060,000 verses $6,430,00) is that he "updated" one of the figures. (T2 at 151–58.)

The Kohler analysis begins with the identification of Old Dominion's assets according to an August 31, 1984 balance sheet. (T2 at 155.) Mr. Kohler made two adjustments to these assets in arriving at the updated figure. (T2 at 151–58.) From these calculations, Mr. Kohler concluded that the fair market value of the shareholder's equity in Old Dominion was $12,041,385.27. (Def.'s Ex. 11.) From this figure, Mr. Kohler first deducted the value of $2,520,000.00 for preferred stock to get a common stock equity of $9,521,385.27. (Def.'s Ex. 11; T2 at 158–61.) Then, Mr. Kohler applied a 25% discount to the common stock equity in order to take account of the fact that Old Dominion is a foreign domiciled company, and to reflect its correspond-

ing marketability in the United States. (T2 at 161–65.) Accordingly, Mr. Kohler concluded that applying the 25% discount provides a common stock equity of $7,141,038.95 with the 900 shares equalling $6,426,935.06. (Def.'s Ex. 11; T2 at 165–66.)

■ The Court is not persuaded by the Kohler analysis; rather, the Court finds that the Willamette report submitted by the government is the more appropriate method of valuation. (Govt.Ex. 104.) This report was prepared by WMA and is an independent evaluation opinion prepared in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP) as promulgated by The Appraisal Foundation and endorsed by the American Society of Appraisers. (Govt.Ex. 104; T2 at 45–46.) The Willamette report indicates that an investment value approach, not a fair market value approach, is the more appropriate standard of value in this case. (T2 at 48, 63–65.) An investment standard of value is the value of a company, or the value of an asset, to a very specific or a particular investor such as the United States. (T2 at 48.) WMA opined that an investment standard of value was appropriate in this case due to the criminal forfeiture judgment and the fact that the value had to be assigned as of October 15, 1984, approximately ten years earlier. (T2 at 49–50.) Further, WMA concluded that a 5%, rather than a 25%, discount would be appropriate in association with a liquidation approach to the Old Dominion assets. (T2 at 64–66.)

As for the Kohler report, WMA opined that there were several errors, in addition to using a fair market standard of value, that should be noted. (T2 at 50.) First, the Kohler report's initial figure was the total asset value according to a August 31, 1984 financial statement; however, WMA notes that the Kohler report did not account for substantial changes in the value of Old Dominion assets between August 31, 1984 and October 15, 1984, the date of valuation. (T2 at 51.) Also, WMA adjusted the level of investment income being generated to Old Dominion and an adjustment was made to an Old Dominion certificate of deposit to account for the exchange rate between the Deutsche mark and the United States dollar.

(T2 at 55–57.) The exchange rate adjustment actually created a slight decrease in the Kohler report figures for total assets. (T2 at 56.) Finally, WMA took an alternative method for valuing the preferred stock which was considered to be a more appropriate method of determining the economic value of the stock. (T2 at 58–62.)

Further, the Court credits the opinion of the government's expert on the appropriate weight that should be applied to the reinsurance treaties. (Govt.Ex. 62, 63, 64 & 65.) WMA opined that the Kohler report incorrectly listed a reinsurance treaty between Old Dominion and Executive Life Insurance Company as a contingent liability. (T2 at 53.) The government's reinsurance expert opined that the reinsurance treaties were perfect examples of a shame reinsurance transaction because there was absolutely no risk transferred whatsoever. (T2 at 14–15, 19, 20, 134.) Part of the definition of insurance is the transfer of risk; further, there can be no transfer of risk, or insurance, because it was not transferred to an insurance company. (T2 at 11, 13.) Old Dominion was not licensed to sell insurance, (T1 at 90; T2 at 129–34), and prior to 1984, Old Dominion had suffered no losses under the Executive Life reinsurance treaty. (T2 at 55.) Accordingly, the Court is not persuaded that the Kohler report correctly identified a reinsurance liability of $2.25 million. (T2 at 168–70.)

Using an investment value standard, the Willamette report devised a total Old Dominion equity value on October 15, 1984 of $14,208,245.27. (T2 at 67; Govt.Ex. 104 at 14.) WMA then subtracted the value of the preferred stock, $1,972,174.00, to arrive at a figure of $12,236,071.27 for the total value of common stock. (T2 at 67; Govt.Ex. 104 at 14.) WMA then applied a 5% discount for risk marketability to arrive at a discounted value for Old Dominion common stock of $11,624,267.71, with the 900 shares of Old Dominion common stock valued at $10,461,840.94 on October 15, 1984. (T2 at 67–68; Govt.Ex. 104 at 14.) WMA's analysis takes into consideration all of the factors it found to be incorrect in the Kohler report. (T2 at 68.) For instance, the Willamette report

lists the value of the preferred stock as $1,972,174.00, rather than $2,520,000.00, and it applied a 5%, rather than a 25%, discount for risk marketability. (T2 at 67–68; Govt. Ex. 104 at 14.)

Finally, WMA adjusted its valuation of the 900 shares of Old Dominion common stock to take into consideration several other factors relating to the valuation of key balance sheet items in light of the 1984 formal year end financial statements. (Govt.Ex. 104 at 15.) These factors were the termination of the Pinnacle Reinsurance Company reinsurance treaty and the negotiated redemption of the minority 100 shares of common stock and all outstanding preferred stock for $2,400,000. (Govt.Ex. 104 at 15.) WMA opined that each of these events provided them a more accurate representation of the value of the reinsurance agreements and the Old Dominion stock in which the government did not have any interest (i.e., the preferred stock and 100 shares of common stock). (Govt.Ex. 104 at 15.) With these considerations in mind, the Willamette report concludes that the value of the 900 shares of Old Dominion common stock on October 15, 1984 was $11,217,883.01. (Govt.Ex. 104 at 16.)

Accordingly, the Court finds that the value of the 900 shares of Old Dominion common stock exceeded $7,000,000 on October 15, 1984. The Court finds the testimony of the government's valuation and reinsurance experts to be more credible than Mr. Barnette's experts. Although the government argues that the Court is not required to ascertain an exact value and therefore, all of the assets should be forfeited, the Court finds that *Acosta* is distinguishable from the case *sub judice*. Unlike *Acosta*, neither the jury or the trial judge in this case ascertained the value of the forfeited property or the value of any items purchased with the proceeds of the RICO enterprise. Further, unlike *Acosta*, the Court finds that the evidence clearly demonstrates that the 900 shares of Old Dominion common stock on October 15, 1984 was worth $11,217,833.01. Therefore, pursuant to the criminal forfeiture

judgment entered October 15, 1984 and the Court's February 7, 1991 Order, where the Court found that the $7,000,000 in restitution would be a set-off against any forfeiture, the Court finds that Mr. Barnette should now forfeit to the United States $4,217,833.01, or the difference between the value of the 900 shares of Old Dominion common stock and the $7,000,000 in restitution deposited into the court's registry on January 10, 1985.

### B. Contempt

■ A critical distinction exists between criminal and civil contempt, and the analysis of the United States' contempt petitions must necessarily address whether the alleged contempt is criminal or civil. *See Int'l Union, United Mine Workers of Am. v. Bagwell,* —— U.S. ——, ——, 114 S.Ct. 2552, 2556, 129 L.Ed.2d 642 (1994) (noncompensatory contempt fines were criminal and constitutionally could not be imposed absent a jury trial); *United States v. Mathews,* 997 F.2d 848, 851 (11th Cir.1993) (appellate review of criminal contempt conviction precluded in absence of certification of contempt), *cert. denied,* —— U.S. ——, 114 S.Ct. 647, 126 L.Ed.2d 605 (1993). Noting this distinction, the Supreme Court has said:

> Criminal contempt is a crime in the ordinary sense, and criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings. For serious criminal contempts involving imprisonment of more than six months, these protections include the right to jury trial. In contrast, civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required.

*Bagwell,* —— U.S. at ——, 114 S.Ct. at 2556 (internal citations omitted).[5]

**5.** The *Bagwell* decision dealt only with indirect contempts, or contempts occurring out of court, and the Supreme Court noted that those contempts occurring in the court's presence may be immediately adjudged and sanctioned summarily, and with the exception of serious criminal contempts, the distinction between criminal and civil proceedings does not pertain. *Bagwell,* ——

▆▆ The United States' contempt petitions were filed pursuant to 18 U.S.C.S. § 401 (1993) [6] and are labeled as being in the nature of "civil" contempt. A civil contempt petition is a civil action governed by the Federal Rules of Civil Procedure. *Rogers v. Webster*, 776 F.2d 607, 610 (6th Cir.1985). However, "the stated purposes of a contempt petition alone" are not determinative of its character as criminal or civil. *Bagwell*, — U.S. at —, 114 S.Ct. at 2556 (citation omitted). Although alleged contempt is traditionally considered to be criminal if the sanction is punitive and civil if the sanction is remedial, the exact nature of the contempt must be drawn "from an examination of the character of the relief itself." *Id.* at —, 114 S.Ct. at 2557 (citations omitted).

▆▆ Accordingly, the most appropriate civil contempt sanction is said to be indefinite confinement until the contemnor complies with a court order. *Id.* A fixed sentence of confinement is punitive and thus, criminal if imposed retrospectively for a "completed act of disobedience" in which the contemnor cannot comply with a court's directives. *Id.; Mathews*, 997 F.2d at 851. In the context of fines, this sanction is considered civil if it either coerces the contemnor into compliance with a court's directive or compensates the petitioner for losses it sustained from noncompliance. *Bagwell*, — U.S. at —, 114 S.Ct. at 2557 (citations omitted). Coercive sanctions can only be civil if the contemnor is afforded the opportunity to purge himself of non-compliance. *Id.* at —, 114 S.Ct. at 2557 (citations omitted). Accordingly, the failure to comply with document discovery and payment of a judgment are traditionally considered to be appropriate for civil contempt proceedings and are not considered to be criminal. *Id.* at —, 114 S.Ct. at 2560.

▆▆ In order to prove civil contempt, the petitioner must prove by clear and convincing evidence that either the underlying order, or the court's directives, was violated. *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir.1990) (citations omitted). The proper focus of the court's inquiry into a civil contempt petition is not the subjective belief or intent of the alleged contemnor, but whether the order was in fact violated. *Id.* at 1516 (citations omitted). Ambiguities should be resolved in favor of the party charged with contempt. *Harris v. City of Philadelphia*, 47 F.3d 1311, 1326 (3d Cir. 1995). Further, when addressing a contempt petition "[n]onparties who reside outside the territorial jurisdiction of a district court may be subject to that court's jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order." *Waffenschmidt v. MacKay*, 763 F.2d 711, 714 (5th Cir.1985) (knowing violation of court's injunction order by agent of a party who aids and abets that party's violation of the order permits personal jurisdiction over that individual), *cert. denied*, 474 U.S. 1056, 106 S.Ct. 794, 88 L.Ed.2d 771 (1986).

▆▆ "[O]nce the moving party makes a prima facie showing that the court order was violated, the burden of production shifts to the alleged contemnor to show a 'present inability to comply that goes beyond a mere assertion of inability.'" *Khimani*, 892 F.2d at 1516 (citations omitted); *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir.1984) (citing *Maggio v. Zeitz*, 333 U.S. 56, 74–78, 68 S.Ct. 401, 411–412, 92 L.Ed. 476 (1948)). "Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance." *Khimani*, 892 F.2d at 1516 (citation omitted). However, the alleged contemnor "must go beyond a mere assertion of inability and satisfy his burden of production on the point by introducing evidence in support of his claim." *Hayes*, 722 F.2d at 725 (citation omitted).

U.S. at — n. 2, 114 S.Ct. at 2557 n. 2 (citations omitted).

**6.** Title 18 U.S.C. § 401 provides that:
A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none others, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
(2) Misbehavior of any of its officers in their official transactions;
(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

■ As a threshold matter, the Court must first identify the requested sanction and determine whether it is criminal or civil in nature. The United States' contempt petitions request coercive sanctions consisting of both imprisonment and fines until such time as Mr. Barnette, and his former wife Kathleen Barnette, purge themselves of contempt by complying with the various court orders and returning the wrongfully converted Old Dominion assets. Of course, this request assumes that the United States is entitled to the assets in the first place. Nonetheless, the Court finds that a contempt sanction of either imprisonment or fines intending to coerce Mr. Barnette into compliance with a court order or returning wrongfully converted Old Dominion assets would be civil, rather than criminal in nature.[7] *See Bagwell,* —— U.S. at ——, 114 S.Ct. at 2557 (citations omitted).

### 1. Violation of trial court's restraining order

On October 18, 1983, the trial court entered a temporary restraining order enjoining Mr. Barnette, or any of his agents or persons acting in concert with him, from selling, assigning, pledging, distributing, encumbering, transferring, discharging, or otherwise disposing of any legal or equitable interest, right, or claim in Old Dominion.[8] The government argues that Mr. Barnette and his wife Kathleen Barnette[9] violated this restraining order in July and August of 1984 by transferring Old Dominion assets worth approximately $2.409 million to personal accounts held by Kathleen Barnette in Switzerland and England. Further, the United States argues that both of the Barnettes violated the restraining order on numerous occasions after the entry of the criminal forfeiture judgment on October 15, 1984.

In addressing this issue, the Court must distinguish between pre-judgment and post-judgment conduct because an issue exists whether the trial court's restraining order was dissolved in 1984. The trial court's criminal forfeiture judgment opinion of October 15, 1984 literally states that "the Order Settling Pretrial Forfeiture Proceedings of October 18, 1984, [sic] is hereby dissolved." Thus, Mr. Barnette argues that there was no post-judgment violation of the restraining order because it was no longer in effect. In sum, Mr. Barnette claims that the government is simply harassing him and that the government's actions amount to "persecution, not prosecution." The United States contends that the restraining order was only dissolved in part by the criminal forfeiture judgment opinion and that Mr. Barnette is still precluded from liquidating Old Dominion's assets. The government cites numerous instances of liquidation and has submitted financial exhibits purportedly documenting these violations.

In order to prove civil contempt, the petitioning party must prove by clear and convincing evidence that the underlying order was violated. *Khimani,* 892 F.2d at 1516. This, of course, would necessitate the Court's determination whether the October 18, 1983 restraining order remained in effect after the criminal forfeiture judgment was entered in 1984 and whether either of the Barnettes violated this restraining order. On October 18, 1983, the trial court entered an order restraining Mr. Barnette, his agents, or persons acting in concert with him from disposing of his legal or equitable ownership in Old Dominion. This restraining order was entered pursuant to a joint stipulation between the government and Mr. Barnette. Subsequent to Mr. Barnette's conviction, the government requested the trial court to *inter alia* require Mr. Barnette to deposit his 900

---

**7.** This contempt sanction would also be civil because it would compensate the United States for any losses it suffered as a result of the alleged wrongful transfer of Old Dominion assets. *See Bagwell,* —— U.S. at ——, 114 S.Ct. at 2557 (citations omitted).

**8.** The restraining order specifically permitted expenditures from Old Dominion's assets for normal business operations and the payment of all

business salaries provided that they did not exceed the level of comparable salaries paid during the year terminating August 31, 1983.

**9.** Kathleen Barnette is allegedly a person enjoined by this restraining order as either a director of Allied Management Corp., a person in active concert or participation with Mr. Barnette, or as a director and president of Old Dominion.

shares of Old Dominion common stock into the court's registry pending the entry of a criminal forfeiture judgment.

In response, Mr. Barnette opposed the government's motion and moved the trial court to dissolve the restraining order with exception to Mr. Barnette's 900 shares of Old Dominion common stock which were subject to criminal forfeiture. In this motion, Mr. Barnette specifically provided that he had no objection to the restraining order staying in full force and effect as to the provisions enjoining Mr. Barnette and his agents, servants, employees, and those persons in active concert or participation with him being enjoined from disposing of any legal or equitable interest of Mr. Barnette in Old Dominion. The government opposed Mr. Barnette's motion and requested that the restraining order remain in effect as to all ownership interests in Old Dominion. In other words, the government requested that the trial court leave the restraining order in effect as it precluded any party owning a legal or equitable interest in Old Dominion, not just Mr. Barnette, from disposing of that interest.

■ It is evident from reviewing these motions that the government's desire was to prevent the liquidation and devaluation of Old Dominion and to effectuate the criminal forfeiture of the 900 shares of common stock. In light of this, the trial judge granted in part Mr. Barnette's motion to dissolve the restraining order and ordered Mr. Barnette's 900 shares forfeited on October 15, 1984. The trial judge further ordered that the October 18, 1983 restraining order be dissolved. It appears obvious to the Court that once the criminal forfeiture judgment was entered, the trial judge no longer viewed the restraining order as necessary, except as to the 900 shares of Old Dominion common stock ordered forfeited. As such, the trial judge denied the government's motion "except as to the terms and conditions of the criminal forfeiture judgement entered on this date." Thus, Mr. Barnette and his agents, servants,

employees, and those persons in active concert or participation with him are precluded from transferring any Old Dominion assets that would interfere with the criminal forfeiture judgment. Accordingly, in all other respects the Court finds the restraining order dissolved and the United States has not demonstrated by clear and convincing evidence that Mr. Barnette's actions subsequent to October 15, 1984 otherwise violated the Court's October 18, 1983 restraining order.[10]

Notwithstanding the Court's finding that the restraining order was dissolved on October 15, 1984, the issue remains whether there was a pre-judgment violation of the restraining order in 1983 by transferring Old Dominion assets to Kathleen Barnette's personal bank accounts in Switzerland and England. Mr. Barnette contends that the government's allegations of contempt for violating the trial court's restraining order in 1983 is barred by equity or any federal statute of limitations. *See DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 157, 103 S.Ct. 2281, 2287, 76 L.Ed.2d 476 (1983) (court must borrow most suitable statute or other rule of timeliness from some other source when there is no federal statute of limitations expressly applicable to the suit at hand); *Smith v. City of Chicago*, 769 F.2d 408, 411 (7th Cir.1985) (although there is no fixed statutory limitations period for civil contempt federal courts may borrow suitable periods of limitations from other statutes as a matter of federal law). However, the Court finds that the interests of justice outweigh any potential running of a limitations period due to the government's inability to trace the transfer of Old Dominion assets to Kathleen Barnette's personal accounts in Switzerland and Europe until May 17, 1993, when Kathleen Barnette's counsel submitted various documents in response to the government's request for production. (Supp.Contempt Pet. Ex. G–3; Govt.'s Ex. 81.) *See Burnett v. New York Central R.R. Co.*, 380 U.S. 424, 428, 85 S.Ct. 1050, 1055, 13 L.Ed.2d 941

10. However, to the extent that the trial court's restraining order remained in effect through the criminal forfeiture judgment to preclude the liquidation of Old Dominion assets, the Court finds that the evidence submitted by the government to demonstrate a violation of this restraining order should be considered in conjunction with the Court's determination whether Mr. Barnette and his former wife, Kathleen Barnette, should be held in contempt of court for evading the terms of the criminal forfeiture judgment.

(1965) (policy of repose designed to protect defendants is frequently outweighed where the interests of justice require vindication of the plaintiff's rights); *Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir.1993).

The United States contends that Mr. Barnette transferred Old Dominion assets worth approximately $2.409 million to personal accounts held by Kathleen Barnette in Switzerland and England in July and August of 1984. Specifically, the government submits that Mr. Barnette: 1) sold 64,000 shares of California Federal Savings common stock, and 2) cancelled a certificate of deposit held by Old Dominion in the Banque Nationale de Paris in Panama.[11] The proceeds of these conversions were allegedly transferred from Old Dominion accounts to the personal accounts of Kathleen Barnette in Switzerland and England.

 The evidence presented by the United States demonstrates that 64,000 shares of California Federal Savings stock was sold on July 26, 1984 by the Banque Nationale de Paris yielding proceeds of $814,972.49, (Govt.'s Ex. 55; T3 at 9–13), and that these proceeds were transferred to the accounts controlled by Kathleen Barnette in Switzerland and England. (Govt.'s Ex. 55 & 81; T3 at 23–24.) Further, a $1.594 million certificate of deposit held by Old Dominion in Panama was cashed on August 14, 1984, and the proceeds transferred to an unidentified account in Switzerland. (Govt.'s Ex. 82; T3 at 10.) Mr. Barnette contends that these transactions were done in the normal course of business for the purpose of reinvesting and managing assets and thus, were not in violation of the trial court's restraining order. (T3 at 22–23.)

It is indisputable that these assets were transferred to unidentified bank accounts in Switzerland and England. (Ex. 55, 81, 82; T3 at 23–24.) Mr. Barnette testified that these assets were transferred to a ciphered account in the control of Kathleen Barnette. (T3 at 23.) James L. Morrell, an accountant employed by Mr. Barnette and responsible for preparing the books and records of Old Dominion, testified that it was impossible to discern the identity of the recipient of these funds or to determine whether they were owned by Old Dominion. (T3 at 137–38.)

Nonetheless, the assets remained listed on Old Dominion's August 31, 1984 financial statement, (Def.'s Ex. 1 & 2), and Mr. Morrell testified that these transfers were not reported on the *in camera* financial reports that the trial court ordered to be submitted. (T1 at 31–32, 43.) When specifically asked whether the proceeds of the sale of the California Federal Savings stock was transferred out of Old Dominion and into Kathleen Barnette's control, Mr. Morrell responded that only Kathleen Barnette's salary of approximately $105,000 was transferred out of Old Dominion's control. (T1 at 44–45.) Further, Kathleen Barnette was paid additional salaries by Old Dominion in 1984 and 1985 from the Switzerland bank account. (Govt.'s Ex. 87 & 90.)

Finally, the United States argues that Mr. Barnette failed to timely submit quarterly *in camera* financial reports in violation of the trial court's October 18, 1983 restraining order. Specifically, the government argues that a financial report due in May of 1984 was not filed until June 20, 1984, and that there is no docket entry indicating the filing date of the August 31, 1984 financial report. (T3 at 16–20.) Although the government alleges that these reports are erroneous as well as untimely, the reports were indeed filed. (T3 at 16–20.)

 Accordingly, the Court cannot find by clear and convincing evidence that these transactions were in violation of the restraining order entered to ensure the presence of Old Dominion assets in the event of forfeiture. Although the Court is not entirely persuaded that these transactions were effectuated in the normal course of Old Dominion's business and arguably may appear to be fraudulent transactions, the evidence simply does not conclusively demonstrate that they were intended to dissipate Old Dominion as-

11. The government also alleges that the trial court's restraining order was violated when Old Dominion paid Kathleen Barnette a salary of $104,560 in 1983; however, such a salary was specifically authorized by the restraining order. The testimony elicited during the hearings was that this salary was below that paid to other officers. (T3 at 146.)

sets in violation of the restraining order. Nor has the government proven, with perhaps the exception of the $105,000 salary paid to Kathleen Barnette, by clear and convincing evidence that Old Dominion either was or was not the owner of the $2.409 million in transferred assets. Quite simply, the Court finds that based upon the evidence it is unable to determine either that these transfers or the timeliness of the *in camera* financial reports were in violation of the trial court's restraining order and "[a]mbiguities should be resolved in favor of the party charged with contempt." *Harris*, 47 F.3d at 1326. Therefore, the Court finds that, with exception of the criminal forfeiture judgment, the United States' contempt petition should be denied as to the trial court's restraining order.[12]

### 2. Failure to produce Old Dominion records

The Court's February 7, 1991 Order directed Mr. Barnette to produce to the government all relevant financial information, including the original books and records of Old Dominion and any of its bank accounts. Pursuant to the Court's directive, Mr. Barnette and the United States filed a stipulation with the Court on November 18, 1992, regarding the Old Dominion records; however, they were unable to stipulate to the documents that: 1) neither the United States or Mr. Barnette had possession, and 2) the documents in Mr. Barnette's possession or to which he has access. The government argues that Mr. Barnette is in contempt of the Court's February 7, 1991 Order for withholding original Old Dominion books, records, and bank accounts. Mr. Barnette responds that he has produced all documents, whether originals or copies, in his possession or to which he has access.

The evidence indicates that based upon the advice of his attorney, Mr. Barnette interpreted the Court's order to require production of only the records in his possession, (T3 at 25, 28, 157–58; Barnette Dep., Govt.Ex. 139 at 266), and such records were produced. (T3 at 26, 58.) Mr. Barnette contends that he initially turned over to the government everything he had in his possession pertaining to Old Dominion, (T3 at 26), but that after the government filed the original contempt petition he attempted and did locate additional documents. (T3 at 58–59.) Although Mr. Barnette admits that the records he produced were insufficient to value the Old Dominion stock, he vigorously contends that the government has acquired all other documents through the criminal case, two civil cases, and tax related litigation. (Barnette Dep., Govt.Ex. 138 at 122; T3 at 26–28, 157–165.)

■ Notwithstanding Mr. Barnette's interpretation, the United States requested more extensive records, especially for the years 1981 through 1984. (T3 at 28, 31.) In response to this inquiry, Mr. Barnette cooperated with the government in an attempt to identify the records in the government's possession. (T3 at 32.) The testimony suggests that they were able to locate copies of some of the alleged missing records but that they remained listed as missing in the parties stipulation because the government insisted on locating the originals. (T3 at 32–33.) Mr. Barnette stated that a special agent informed him that the Federal Bureau of Investigation alone has 300,000 documents relating to Mr. Barnette, not including the records in the possession of the Internal Revenue Service from tax related litigation. (T3 at 33.) Nonetheless, Mr. Barnette concluded that only the 1982 and 1983 Old Dominion ledgers are missing and that he believes they are in the possession of the Internal Revenue Service. (T3 at 37–38, 46, 165–66.) Finally, Mr. Barnette has repeatedly offered to help the government locate the missing records. (T3 at 41–42, 92.)

---

**12.** Notwithstanding the Court's finding, the Court is not persuaded either that Mr. Barnette was unaware of these transactions or that they were effectuated solely at the direction of Kathleen Barnette. The evidence demonstrates that the decision to sell the California Federal Savings stock was made by Kathleen Barnette based upon Mr. Barnette's "advice." (Kathleen Barnette Dep., Govt.Ex. 113 at 24–28.) Confirmation of this transaction by the Banque Nationale de Paris in Panama was directed to "Mr. Larry Barnette" who, asserting that it was erroneously sent to him, altered the addressee to indicate that it was directed to "Mrs. Larry Barnette" by adding a handwritten "s" to the formal designation "Mr.". (Govt.Ex. 55; T3 at 11–13.)

After the government filed the original contempt petition, Mr. Barnette retrieved several financial records from the law office of James O'Donnell, another former attorney in this matter, and delivered them to his counsel, Christine Clark. (T3 at 50–52.) Mr. Barnette testified that he assumed his counsel turned these documents over to the government. (T3 at 51–52.) His former counsel, Ms. Clark, testified that she did indeed turn these documents over to the government. (T3 at 139.) In support of his contention that he has attempted to fully comply with the Court's order, Mr. Barnette produced the testimony of his former counsel, Ms. Clark. Ms. Clark testified that in an attempt to comply with the government's request for production she searched every Mr. Barnette file in her office, contacted Kathleen Barnette and her attorney, contacted Mr. Barnette's former attorneys and accountants, requested and received information from numerous foreign banks, accounting firms, and even attempted to travel to Washington, D.C. to review documents in the possession of the government. (T3 at 123–33; Def.'s Ex. 8.) Ms. Clark testified that at no point did either she or Mr. Barnette attempt to remove, change, or destroy any of these documents. (T3 at 128.) Ms. Clark affirmed that Mr. Barnette represented to her that he did not know the location of the missing Old Dominion ledgers for 1982 and 1983. (T3 at 129.)

This testimony, although not exclusive of the document production issues in this matter, illustrates the quandary in which the government has been placed. Quite simply, there are missing financial records; however, it is not readily apparent that Mr. Barnette has failed to comply with the Court's February 7, 1991 Order. In fact, the evidence suggests that notwithstanding Mr. Barnette's attempts to identify and produce all relevant financial documents, there are important ledgers missing for the years 1982 and 1983. Nevertheless, the Court cannot find by clear and convincing evidence that Mr. Barnette failed to comply with the Court's order by

either refusing to produce these ledgers, failing to locate these ledgers, or destroying the ledgers. This same ambiguity regarding the location of the missing ledgers applies to the whole state of affairs involving this discovery dispute and must be resolved in favor of the alleged contemnor. *Harris,* 47 F.3d at 1326. Accordingly, the Court finds that the United States has not demonstrated a prima facie case of contempt on this issue. *Khimani,* 892 F.2d at 1516.[13]

### 3. Failure to deposit Old Dominion stock into the court's registry

On February 22, 1995, this Court ordered Mr. Barnette, pursuant to the October 15, 1984 criminal forfeiture judgment, to produce 900 shares of Old Dominion common stock within ten days. Upon production, the Court ordered the stock to be held by the clerk in the court's registry pending a valuation. Mr. Barnette failed to produce the stock in violation of the Court's order; however, the Court stayed the issuance of a contempt warrant for Mr. Barnette's arrest until after the May hearings were conducted. As previously noted, these hearings were conducted on May 15, 16, and 31, 1995.

██ Mr. Barnette has continuously argued that he is unable to produce the 900 shares of Old Dominion common stock because he transferred ownership of this stock to his wife and children on August 19, 1983. Regardless of this assertion, the Court ordered the stock produced and Mr. Barnette failed to comply with this directive. However, the evidence indicates that in an attempt to comply with the Court's order, Mr. Barnette requested both by telephone on February 22, 1995 and a letter dated February 23, 1995, that Kathleen Barnette produce the stock. (Feb. 24, 1995 Barnette Aff.; Mot. to Stay Issuance of Contempt Arrest Warrant, Ex. A; Barnette Dep., Govt.Ex. 141 at 12.) Further, Mr. Barnette met with his former wife in London on February 28, 1995 and "pleaded" with her to hand over the stock; however, she refused to do so on the advice

---

**13.** Even if the government had established a prima facie case of contempt, the Court finds that Mr. Barnette has established the inability to comply with the Court order because he has identified evidence suggesting the documents were either in the possession of the government or missing. *Hayes,* 722 F.2d at 725 (citation omitted).

**1538**

of her attorney. (Mot. to Stay Issuance of Contempt Arrest Warrant, Ex. B & C; Barnette Dep., Govt.Ex. 141 at 14.)

 The United States responds that Mr. Barnette has not established the actual transfer of this stock to his wife and children. For instance, Mr. Barnette, and not his wife or children, is identified as the record owner of this stock on a Treasury Form 5471 for the period of June 1, 1983 through May 31, 1984. (Barnette Dep., Govt.Ex. 140 at 200–01.) Hence, the government contends that Mr. Barnette has retained control of this stock. Mr. Barnette, however, asserts that the identification of himself as the legal owner of the stock on the Treasury Form 5471 is a clerical error. (Barnette Dep., Govt.Ex. 140 at 201.) Further, the evidence reveals that Mr. Barnette continued to instruct Old Dominion's accountant, Mr. Morrell, on how to prepare the company books and records after this purported transfer. (T1 at 36.) Accordingly, the Court finds that Mr. Barnette failed to comply with the Court's February 22, 1995 Order; therefore, the government has established a prima facie case of contempt. *Khimani,* 892 F.2d at 1516 (citation omitted). However, non-compliance with a court order may be excused when there is substantial compliance made in a good faith effort at compliance. *Id.* The issue, therefore, is whether Mr. Barnette's attempts to persuade Kathleen Barnette to produce the stock was a good faith effort to comply with the Court's order.

 In support of his assertion of inability, Mr. Barnette testified and submitted his own affidavit, including a copy of a letter to his former wife, requesting that the stock be surrendered. The record also contains a lengthy letter from Kathleen Barnette's attorney in London, directed to Mr. Barnette's attorney, indicating his advice to Kathleen Barnette to neither surrender the stock to Mr. Barnette or arrange for its deposit in the court's registry. (Def.'s Mot. to Stay Issu-

ance of Contempt Arrest Warrant, Ex. C.) Further, the deposition testimony, as well as the testimony during the May hearings, document Mr. Barnette's attempt to obtain the stock. (Barnette Dep., Govt.Ex. 141 at 12–20; T3 at 88–89.) Therefore, the Court finds that Mr. Barnette has satisfied his burden of production by introducing evidence supporting his claim of inability to comply with the court order. *Hayes,* 722 F.2d at 725 (citation omitted).[14]

### 4. Evasion of the criminal forfeiture judgment

The United States' contempt petitions request that the Court hold Mr. Barnette in contempt of Court for: 1) evading the terms of the criminal forfeiture judgment of October 15, 1984, and 2) wrongful retention and use of forfeited Old Dominion assets. The criminal forfeiture judgment required Mr. Barnette to forfeit 900 shares of Old Dominion common stock as well as restrained, through the October 18, 1983 restraining order, Mr. Barnette or any of his agents or persons acting in concert with him, from selling, assigning, pledging, distributing, encumbering, transferring, discharging, or otherwise disposing of any legal or equitable interest, right, or claim in Old Dominion. On February 7, 1991, the Court found that this forfeiture and the $7,000,000 in restitution paid by Mr. Barnette on January 10, 1985 should be a set-off against each other and that a valuation must be done to determine if the 900 shares exceed $7,000,000. To date, the Court has been unable to rule on this issue and the government seeks to hold Mr. Barnette in contempt of court for failing to satisfy the criminal forfeiture judgment.

 Mr. Barnette contends that a writ of execution, and not a contempt petition, is the proper method of enforcing a money judgment. *See Combs v. Ryan's Coal Co.,* 785 F.2d 970, 980 (11th Cir.), *cert. denied sub*

**14.** The Court makes this finding notwithstanding the government's assertion that Mr. Barnette apparently took an Old Dominion minute book/stock ledger and four empty ledger books from the law office of James O'Donnell on February 14, 1995, (O'Donnell Dep., Govt.Ex. 105 at 22), and the fact that Mr. Barnette repeatedly invoked

the Fifth Amendment in response to questions regarding his discussions with Kathleen Barnette and her counsel, the present whereabouts of these corporate records, and his travel immediately after visiting Kathleen Barnette in London. (Barnette Dep., Govt.Ex. 141 at 54; T3 at 191–92.)

*nom, Simmons v. Combs,* 479 U.S. 853, 107 S.Ct. 187, 93 L.Ed.2d 120 (1986). "A federal court should not ... enforce a money judgment by contempt or methods ther [sic] than a writ of execution, except in cases where established principles so warrant." *Id.* at 980 (citation omitted). However, the judgment in this case is not a money judgment but a criminal forfeiture judgment requiring the forfeiture of intangible personal property. *See United States v. Conner,* 752 F.2d 566, 576–77 (11th Cir.), *cert. denied,* 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985) (forfeiture of specific amount of money is a money judgment). Unlike *Combs,* where a specific amount of money was awarded to the plaintiffs pursuant to a consent decree and *Conner,* where a specific amount of money was forfeited pursuant to 18 U.S.C. § 1963, the criminal forfeiture judgment in this case was for intangible personal property—specifically, 900 shares of Old Dominion common stock. The forfeiture judgment is not of a specific amount of money. In fact, the sole issue precluding the enforcement of the criminal forfeiture judgment, with exception to Mr. Barnette's alleged contumacious conduct, is the exact value of the stock.

■■■ As for the merits of the government's contempt petitions, the Court finds that Mr. Barnette has engaged in a systematic effort designed to evade the terms of the October 15, 1984 criminal forfeiture judgment. This judgment ordered Mr. Barnette to forfeit 900 shares of Old Dominion common stock. While this judgment grants the United States a right, it also imposes on Mr. Barnette an obligation not to engage in conduct intended to impede enforcement of that right. *Cf., Combs,* 785 F.2d at 980 (court may use remedy of citation of contempt to enforce judgment entered pursuant to consent decree); *Shuffler v. Heritage Bank,* 720 F.2d 1141, 1147 (9th Cir.1983) (money judgment entered pursuant to consent decree gave defendant bank a contingent right to foreclosure in the event the judgment was not paid and imposed on the plaintiffs an

obligation not to impede enforcement of that right). Further, the Court finds that the October 18, 1983 restraining order remained in effect to the extent that the criminal forfeiture judgment prohibited the liquidation of Old Dominion's assets. Accordingly, the Court finds that Mr. Barnette has systematically attempted, for over ten years, to impede the government's efforts to enforce their right to the 900 shares of Old Dominion common stock in violation of the trial court's order to forfeit this stock in the criminal forfeiture judgment.[15]

As a threshold matter, the Court notes that Mr. Barnette's attempts to evade the terms of the criminal forfeiture judgment actually began prior to the entry of the judgment on October 15, 1984. Further, the Court notes that it has already found some of the conduct that constitutes this evasive conduct not to be contumacious. For instance, the Court has already found that the transfer of Old Dominion assets in 1983 was not in violation of the trial court's restraining order. Also, the Court has already found that Mr. Barnette should not be held in contempt for allegedly violating the Court's February 7, 1991 document production order. However, in regards to the criminal forfeiture judgment, the Court does not find that either of these individual acts, whether occurring before or after the judgment, are contumacious; rather, the Court finds that each act was part of an overall design intended to evade the terms of the forfeiture judgment. It is this overall design that the Court finds to be contumacious.

In support of this determination, the Court finds that Mr. Barnette initiated this design to evade the terms of the criminal forfeiture judgment as early as 1983. As noted earlier, Mr. Barnette transferred possession of the 900 shares of Old Dominion common stock on the eve of indictment to his former wife Kathleen Barnette and their children. (T3 at 155.) The Court entered an order on February 22, 1995 disgorging Kathleen Barnette of

---

**15.** The Court recognizes that the forfeiture of the 900 shares of Old Dominion common stock is contingent on its value being in excess of $7 million on October 15, 1984. Despite this contingency, the Court finds that Mr. Barnette has

engaged in contumacious conduct in violation of the trial court's order of forfeiture in the criminal forfeiture judgment. *Cf., Shuffler,* 720 F.2d at 1147 (defendant's right to foreclosure contingent on plaintiff's failure to pay money judgment).

this stock and directing it to be deposited into the court's registry pending the final resolution of this matter. Despite this court order, neither the Court, the government, nor Mr. Barnette have been able to retrieve this stock from Kathleen Barnette and her children. The Court finds that this purported transfer, as well as the subsequent refusal to deposit the stock into the court's registry, is part of an overall design to impede the enforcement of the criminal forfeiture judgment.[16]

Further, Mr. Barnette secretly transferred $2.409 million of Old Dominion assets to accounts held by Kathleen Barnette in Switzerland and England in July and August of 1984. (Govt.Ex. 55, 81, & 82; T3 at 9–13, 23–24.) Although this act is not in of itself contumacious, the Court finds that it is part of an overall design to hide Old Dominion assets and impede any potential forfeiture upon conviction. For instance, these assets were transferred to unidentified bank accounts in Switzerland and England, (Ex. 55, 56, 81, 82; T3 at 23–24), purportedly in the control of Kathleen Barnette. (T3 at 23.) However, the transfers were so vague, despite totaling $2.409 million, that it is impossible to discern either the identity of the recipient of these funds or whether they were indeed owned by Old Dominion. (T3 at 137–38.) In fact, Mr. Barnette's accountant, Mr. Morrell, did not even discover these transfers until 1985 while working on the 1984 financial records. (T1 at 46.)

Despite the vagueness regarding the transfer of these assets, they remained listed on Old Dominion's August 31, 1984 financial statement, which was submitted to the trial court as an *in camera* financial report. (Def.'s Ex. 1 & 2.) However, this report did not identify the transfer of this money from Panama to Switzerland and England. (T1 at 43, 46; Govt.Ex. 56.) Also, Mr. Barnette

belatedly submitted a May 31, 1984 financial report and it is not clear when exactly the August 31, 1984 report was filed. (T3 at 16–20.) Accordingly, the Court finds that this transfer was part of a course of conduct intended to impede the government's enforcement of the criminal forfeiture judgment by confusing the exact nature of the transaction and location of Old Dominion assets.

After his conviction and the entry of the criminal forfeiture judgment, Mr. Barnette continued to exercise significant control over the business operation of Old Dominion while incarcerated. (Govt.Ex. 58; T1 at 59.) In order to assert this influence, Mr. Barnette telephoned his accountant Mr. Morrell from federal prison almost every day. (T1 at 58.) Mr. Morrell testified that Mr. Barnette was concerned "that he could wind up virtually penniless" due to his wife's involvement with another man. (T1 at 94.) This testimony, as the government argues, exemplifies Mr. Barnette's intent to share Old Dominion assets with his former wife.

After the criminal forfeiture judgment was entered, the United States had Old Dominion assets in the Banque Nationale de Paris in Panama frozen pending forfeiture. (T1 at 49; Govt.Ex. 58.) Mr. Barnette instructed Mr. Morrell to go to Panama and attempt to have these assets unfrozen. (T1 at 50; Govt. Ex. 58.) Further, Mr. Barnette sent a telegram to the Banque Nationale de Paris in Panama protesting the freeze. (T1 at 52.) Overall, Mr. Morrell made six or seven trips to Panama in 1987 for the specific purpose of unfreezing the Old Dominion assets. (T1 at 51.)

In an effort to have the Panamanian judicial system approve of a method in which the frozen assets could be removed from Panama,[17] Mr. Morrell testified that Mr. Barnette

---

**16.** The Court makes this finding regardless of the government's contention that the 1983 transfer was in actuality never effectuated. (Govt.Ex. 137 at 94.) Whether it was effectuated or not, the Court finds that its purpose was to defeat any future interest the government may receive in the stock via a forfeiture judgment.

**17.** The record is not clear as to how these funds were actually unfrozen. Mr. Morrell testified

that the funds were unfrozen by the Panamanian courts through either a lapsed court order or some kind of technicality. (T1 at 64.) When this court order expired or lapsed, the funds were removed from Panama. (T1 at 64–65.) When the United States objected to this matter, a Panamanian appellate judge rendered a decision in favor of Old Dominion and Mr. Barnette. (T1 at 64.)

paid Adolfo Ahumada, a Panamanian attorney who was a former ministry of the Panamanian government, $60,000 to prevent the transfer of these frozen funds out of the Banque Nationale de Paris by the United States. (T1 at 63–66.) Mr. Ahumada told Mr. Morrell that he would have to "take care of a [Panamanian] prosecutor in order to have him write a favorable opinion up to an appellate court." (T1 at 61.) Further, Mr. Ahumada "assured" Mr. Morrell that this action would be approved by a Panamanian appellate judge; indeed, the appellate judge rendered a ruling favorable to Old Dominion and Mr. Barnette. (T1 at 64.) Mr. Morrell testified that the payment of this $60,000 was a "bribe." (T1 at 66.) Hence, the Court is not persuaded by Mr. Barnette's contention that he would not engage in such an act because he is a man of character. (T3 at 186.) Accordingly, the Court finds that Mr. Barnette's exertion of influence over Old Dominion's business affairs and his efforts to impede the government's control of Old Dominion assets pending forfeiture illustrates an overall plan to impede the enforcement of the criminal forfeiture judgment.

Finally, Mr. Barnette took a narrow interpretation of the Court's February 7, 1991 Order requiring production of all relevant Old Dominion financial records. (T3 at 25, 28, 157–58; Barnette Dep., Govt.Ex. 139 at 266.) Although Mr. Barnette knew that the purpose of this production was to enable the government to attempt a valuation of the 900 shares of Old Dominion common stock, he admits that the documents he initially produced were clearly insufficient to complete this valuation. (Barnette Dep., Govt.Ex. 138 at 122; T3 at 26–28.) The documents that Mr. Barnette produced did not even begin to fill a single file folder. (Barnette Dep., Govt. Ex. 138 at 121.)

Granted, Mr. Barnette did make an extensive effort to produce additional documents after the United States requested further information and filed its original contempt petition. (T3 at 32–33, 41–42, 50–59, 123–33.) However, as recently as this year, Mr. Barnette surreptitiously removed Old Dominion records from the office files of James O'Donnell. (Govt.Ex. 105 at 22.) The evidence reveals that on February 14, 1995, Mr. Barnette removed Old Dominion minute books and ledgers from Mr. O'Donnell's law office. (O'Donnell Dep., Govt.Ex. 105 at 22.) Mr. Barnette has since asserted the Fifth Amendment when asked about the present whereabouts of those records. (Barnette Dep., Govt.Ex. 141 at 54; T3 at 191.) Mr. Barnette further asserted the Fifth Amendment when asked where he went after he visited Kathleen Barnette in London in February of 1995. (T3 at 191–92.) During this period, Kathleen Barnette traveled to Panama and orchestrated a meeting of Old Dominion's Board of Directors with the intent of precluding the government's control of Old Dominion. (Barnette Dep., Govt.Ex. 141 at 126.) The Court may draw an adverse inference from Mr. Barnette's invocation of the Fifth Amendment privilege that his testimony would not have been favorable on this issue. *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *United States v. A Single Family Residence and Real Property Located At 900 Rio Vista Blvd., Fort Lauderdale,* 803 F.2d 625, 629 n. 4 (11th Cir.1986).

Accordingly, this outline of events only illustrates the overall design to impede enforcement of the criminal forfeiture judgment and is not intended to be exclusive. The extensive record in this matter is replete with repeated examples of evasive conduct. The Court finds that this conduct was an orchestrated attempt by Mr. Barnette to retain control over Old Dominion assets and evade the criminal forfeiture judgment ordering Mr. Barnette to forfeit 900 shares of Old Dominion common stock to the United States. Although the ultimate forfeiture of this stock is dependent on its assigned value on October 15, 1984, the Court finds that Mr. Barnette has attempted to evade this judgment by engaging in contumacious conduct intended to prevent or hamper the government's efforts to value this stock.

Therefore, the Court finds that Mr. Barnette should be held in contempt of the October 15, 1984 criminal forfeiture judgment. Since the Court has already found that $4,217,833.01, or the difference between the value of the 900 shares of Old Dominion

common stock and the $7,000,000 in restitution, should be immediately forfeited, the Court finds that Mr. Barnette shall have ten days from the date hereof to comply with the criminal forfeiture judgment and its order of forfeiture by either paying $4,217,833.01 to the United States or depositing this amount into the court's registry. The failure to comply with this order will result in the issuance of a warrant for Mr. Barnette's arrest and incarceration until such time as the Court finds that Mr. Barnette has purged himself of this contempt. The Court finds this sanction to be coercive and thus, civil in nature. *Bagwell,* —— U.S. at ——, 114 S.Ct. at 2557 (citations omitted).

### 5. Kathleen Barnette

In its supplemental contempt petition, the United States requests that the Court hold Mr. Barnette's former wife, Kathleen Barnette, in contempt of Court for: 1) their collective violations of the trial court's 1983 restraining order, 2) non-compliance with the Court's December 15, 1992 Order permitting the United States to obtain discovery from Kathleen Barnette regarding Old Dominion, and 3) evading the terms of the criminal forfeiture judgment. On April 13, 1995, the Court directed Kathleen Barnette to show cause why she should not be held in contempt of court pursuant to the government's supplemental contempt petition. Kathleen Barnette declined the opportunity to appear before the Court at the May hearings.[18]

The Court has already found, with exception of the criminal forfeiture judgment, that it cannot find that Mr. Barnette violated the trial court's restraining order. This conclusion, and the analysis underlying it, is equally applicable to Kathleen Barnette. Likewise, the Court finds that the record does not support a finding that Kathleen Barnette is in contempt of the Court's December 15, 1992 Order authorizing the United States to obtain discovery from Kathleen Barnette. (Govt.Ex. 46, 47, 48, & 49.) Therefore, the Supplemental Contempt Petition should be denied on these issues.

▮▮ However, the Court finds that Kathleen Barnette aided and abetted, or acted in concert with, Mr. Barnette in his scheme to evade the criminal forfeiture judgment, and this conduct is contumacious. The evidence clearly demonstrates that the transfer of approximately $2.409 million in 1984 was to ciphered accounts in the control of Kathleen Barnette. (Govt.'s Ex. 55, 81 & 82; T3 at 10, 23–24.) The record evinces an intent to share Old Dominion assets with Kathleen Barnette, (T1 at 94), and both Mr. Barnette and his former wife jointly exerted influence over Old Dominion's business affairs. (Govt.'s Ex. 58; T3 at 11.) Kathleen Barnette testified in a deposition that she often acted on Mr. Barnette's "advice." (Govt.'s Ex. 113 at 24–39.) Further, both Mr. Barnette and his wife were implicated in the bribing of Panamanian officials. (T1 at 61–62.)

▮▮ Finally, Kathleen Barnette has refused to relinquish control of the Old Dominion common stock in her possession so that it can be deposited into the court's registry. (Mot. to Stay Issuance of Contempt Arrest Warrant, Ex. B & C; Govt.'s Ex. 141 at 14.) As recently as this year on February 13, 1995, Kathleen Barnette traveled to Panama to conduct an Old Dominion shareholder's meeting intended to thwart the government's attempts to enforce the criminal forfeiture judgment by seizing control of Old Dominion. (T1 at 80–102.) The Court notes that its February 22, 1995 Order was directed only at Mr. Barnette and the criminal forfeiture judgment is an *in personam* judgment against Mr. Barnette. However, nonparties that actively aid and abet a party in violating a court order may be held in contempt of court. *United States v. Paccione,* 964 F.2d 1269, 1274–77 (2d Cir.1992) (nonparty with notice of restraining order may be held in contempt for diversion of funds); *Waffenschmidt,* 763 F.2d at 714–17. Accordingly, the Court finds that Kathleen Barnette had notice of the criminal forfeiture judgment, as well as the trial court's October 18, 1983

---

18. In fact, the Court authorized the United States, pursuant to 28 U.S.C. § 1783, to subpoena Kathleen Barnette, as a United States citizen living abroad, to appear before the Court at the May hearings. In response to this subpoena, Kathleen Barnette informed the Court that she renounced her United States citizenship in 1994 and is now a citizen of St. Kitts–Nevis.

restraining order, yet assisted Mr. Barnette in his effort to evade the enforcement of this judgment. Therefore, the Court finds that Kathleen Barnette is in contempt of the criminal forfeiture judgment and the trial court's October 18, 1983 restraining order as it relates to this judgment.

In respect to the Court's finding that Mr. Barnette should forfeit $4,217,833.01, the Court notes that Mr. Barnette has repeatedly asserted that Kathleen Barnette is the owner of the 900 shares of Old Dominion common stock. However, the Court has already found in its opinion of February 7, 1991 that the government's interest in these shares vested on August 2, 1982. The government's interest, therefore, vested prior to Mr. Barnette's purported transfer of these shares to his former wife and their children. Further, the evidence clearly demonstrates that notwithstanding this purported transfer, Mr. Barnette continued to influence control over Old Dominion's business affairs. (Govt.Ex. 58; T1 at 24–28, 36, 58–59.) Accordingly, the Court finds that this transfer is null and void and any purported interest that Kathleen Barnette or her children have in the $4,217,833.01 the Court has ordered forfeited pursuant to the criminal forfeiture judgment of October 15, 1984 is a nullity.

### III. Conclusion

Pursuant to the Court's opinion, the Court finds that the value of the 900 shares of Old Dominion common stock on October 15, 1984 exceeds $7,000,000. In fact, the Court finds that the evidence submitted by the government clearly demonstrates that the value of this stock on October 15, 1984 is $11,217,-833.01. Accordingly, the Court finds that $4,217,833.01, or the difference between the value of the stock and the $7,000,000 in restitution, should be immediately forfeited to the United States. Further, the Court finds that Kathleen Barnette and her children have no valid interest in this forfeited money.

Finally, the Court finds that Mr. Barnette and Kathleen Barnette are in contempt of the October 15, 1984 criminal forfeiture judgment as well as the trial court's October 18, 1983 restraining order as it relates to this judgment. The Court finds that Mr. Barnette and his former wife, Kathleen Barnette, shall have ten days from the date hereof to comply with the criminal forfeiture judgment and its order of forfeiture by either paying $4,217,833.01 to the United States or depositing this amount into the court's registry. The failure to comply with this order will result in the issuance of a warrant for their arrest and incarceration until such time as the Court finds that they have purged themselves of this contempt. The Court specifically finds this sanction to be coercive and thus, civil in nature.

For the foregoing reasons, it is now

**ORDERED AND ADJUDGED:**

1. That the United States' Motion for Summary Judgment filed January 3, 1995 (Doc. # 1077) is hereby **DENIED as moot.**

2. That pursuant to the court's October 15, 1984 criminal forfeiture judgment the Defendant Larry Barnette shall hereby **FORFEIT** $4,217,833.01 to the United States of America.

3. That the United States' Petition for Civil Contempt filed June 19, 1992 (Doc. # 976) and Supplemental Petition to Adjudicate both Larry and Kathleen Barnette in Civil Contempt filed June 3, 1994 (Doc. # 1063) are hereby **GRANTED** in part and **DENIED** in part and the Defendant Larry Barnette, and his former wife Kathleen Barnette, are hereby found to be in **CONTEMPT** of the October 15, 1984 criminal forfeiture judgment and the October 18, 1983 restraining order; otherwise, the contempt petitions are **DENIED.**

4. That pursuant to the Court's finding of contempt on this date, the Defendant, Larry Barnette, and his former wife Kathleen Barnette, shall have ten (10) days from the date hereof to comply with the terms of this Court's finding of contempt by immediately forfeiting $4,217,833.01 to the United States or depositing this amount into the court's registry or a warrant shall issue for the **ARREST** of the Defendant Larry Barnette, and his former wife Kathleen Barnette, who shall be **INCARCERATED** in the custody of the United States Marshal until such time as the Court finds that they have purged themselves of contempt.

5. That pursuant to the October 15, 1984 criminal forfeiture judgment and the Court's February 7, 1991 Order interpreting same, any potential interest in the sum of money forfeited hereunder of Kathleen Barnette, Leo David Barnette, and Janet Lea Barnette pursuant to the purported transfer of 900 shares of Old Dominion Corp., S.A., formerly known as Old Dominion Insurance Corporation, S.A., common stock on August 19, 1983, is hereby **NULL AND VOID.**

**DONE AND ORDERED.**