**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jose M. SANCHEZ, Defendant–Appellant.**

**No. 92–1157.**

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1994.

Decided July 20, 1994.

Certiorari Denied Oct. 11, 1994.

See 115 S.Ct. 346.

William J. Lipscomb (argued), Penelope C. Fleming, Office of the U.S. Atty., Milwaukee, WI, for plaintiff-appellee.

J. Michael McGuinness (argued), McGuinness & Parlagreco, Salem, MA, for defendant-appellant.

Before BAUER and FLAUM, Circuit Judges, and GRANT, District Judge.*

BAUER, Circuit Judge.

Jose Maria Sanchez, who is also known as "Chema," was convicted of conspiring with the intent to distribute cocaine, distribution of cocaine, and possession with the intent to distribute cocaine in violation of 21 U.S.C. §§ 841 and 846 and 18 U.S.C. § 2. The district court sentenced Chema to a prison term of 190 months. He appeals both his conviction and his sentence.

I.

In April of 1991, Jose Pedroza was a passenger in a car that contained twenty-four kilograms of cocaine. The vehicle, which police searched, contained other evidence relating to Pedroza's drug-dealing, including the address to an apartment in Milwaukee, Wisconsin. On April 17, 1991, with the consent

* The Honorable Robert A. Grant, United States District Judge for the Northern District of Indiana, is sitting by designation.

of the apartment's sole occupant, Martin Guzman, agents of the Drug Enforcement Agency in Milwaukee searched the apartment. The search produced approximately two and one-half kilograms of cocaine and $10,300 in cash. The agents arrested Guzman who at the time was wearing a beeper that continually went off during the search.

DEA agents obtained a search warrant to look at the telephone numbers in the beeper. One such number was listed to Chema's cousin, Juan Sanchez.

Guzman entered into a plea agreement with the government and agreed to talk after his arrest. He explained to government agents that three kilograms of cocaine were stored in Rene Rivas' car, which was parked outside the Milwaukee apartment. Police searched the car and recovered the three kilograms of cocaine described by Guzman. At trial, Guzman testified that the two and one-half and three kilogram quantities of cocaine recovered from the apartment and Rivas' car were left with him by Rivas.

Guzman explained the situation: Rivas had told Guzman that he was leaving for Mexico because Rivas believed the police were looking for him. Rivas directed Guzman to give the cocaine to Chema and another individual named "Chuy." Rivas also left his beeper and drug ledger with Guzman. The drug ledger indicated that Chema owed Rivas $34,000 for cocaine. Rivas also gave Guzman telephone and beeper numbers for Chema and taught Guzman about the drug business. In June of 1991, for example, Rivas and Guzman delivered one-half kilogram of cocaine on consignment to Chema.

A short time later, Chema contacted Guzman on the beeper Rivas had left with Guzman. The two met and Chema gave Guzman $10,000 as partial payment for cocaine which Rivas had previously "fronted" to Chema.

On July 1, 1991, drug-dealer Javier Avila was arrested after he delivered one kilogram of cocaine to an undercover officer. After his arrest, Avila agreed to cooperate with the government. Avila identified Chema as his cocaine supplier and told the police that Chema had provided two kilograms of cocaine to him on consignment on June 27, 1991.

As part of his work with police, Avila placed several telephone calls to the Mexican Village Restaurant in Milwaukee to arrange for a controlled delivery of $10,000 in cash to Chema as partial payment for the cocaine supplied by Chema. On July 3, 1991, Avila drove to the restaurant and met Chema. Avila and Chema met inside the restaurant, then went outside to Avila's car. Avila handed a paper bag to Chema, as instructed by the police. The bag contained $10,000 in cash. Chema opened the bag, looked inside it, then closed it. At that point, police officers emerged from nearby hiding spots and shouted, "police, search warrant, halt."

Juan Sanchez, who stood nearby and acted as a lookout, immediately threw his hands up and surrendered to police. Chema, however, ran and tossed the bag with the money over a six foot fence. The police caught up with him and arrested him. They also recovered the money.

After making the arrests, the police executed a search warrant for the restaurant. They recovered $3,522 in cash in the kitchen area and one kilogram of cocaine from a truck in the restaurant's parking lot. The truck also contained a number of documents with Chema's name.

Chema was tried and convicted for his illegal drug-dealing activities.

## II.

### A. Sufficiency of the Evidence

Chema contends that the evidence in this case is insufficient to sustain his convictions for conspiring with the intent to distribute cocaine, distribution of cocaine, and possession with the intent to distribute cocaine.

In conspiracy cases, like this one, the government must prove membership in the conspiracy by substantial evidence. *United States v. Donovan,* 24 F.3d 908, 913 (7th Cir.1994). Criminal conspiracies are agreements to commit crimes, such as the obtaining of drugs for distribution. *United States v. Lopez,* 6 F.3d 1281, 1290 (7th Cir. 1993).

■ The evidence that Chema conspired with the intent to distribute cocaine, distributed cocaine, and possessed cocaine with the intent to distribute that cocaine is substantial. Several eyewitnesses, including members of the conspiracy itself, testified to his involvement. Law enforcement officials caught him red-handed in possession of $10,000 in police-planted drug money. And searches of the restaurant where Chema worked and of related residences produced even more incriminating evidence: large amounts of cash, cocaine, Chema's name written on drug notes of varying types, and plastic baggies which contained cocaine. This list is not exhaustive.

The evidence of Chema's membership in the conspiracy, his distribution of cocaine, and his possession with the intent to distribute cocaine is more than sufficient.

## B. Evidentiary Rulings

Chema challenges a variety of evidentiary rulings by the district court. Only one merits discussion. He claims that the district court committed reversible error when it admitted certain testimony by Detective John Hepp of the Milwaukee County Sheriff's Department.

■ During Chema's trial, the prosecution asked Hepp why Hepp arranged to make the controlled delivery involving drug-dealer Javier Avila at the Mexican Village Restaurant. Hepp explained that Avila "stated that he [Avila] received some cocaine from [Chema], and [Chema] expected some monies. And our plan was to give him some money as partial payment." In response to an objection by Chema's lawyer, the prosecution explained that this statement was not admitted for the truth of the matter asserted—that Avila received cocaine from Chema—but to explain why Hepp acted as he did. The court agreed and allowed Hepp's testimony.

Chema contends that Avila's statement, admitted through Hepp's testimony, was inadmissible because it was hearsay. The challenged statement, however, was not hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The testimony at issue here was not offered to prove the truth of the matter asserted, but only to prove why Hepp acted as he did. It was not hearsay, and it was not error for the district court to admit it. *See United States v. Levine,* 5 F.3d 1100, 1107 (7th Cir.1993) (testimony offered to prove defendant's motive for hiring hitman to murder relatives was not hearsay because it was not offered to prove the truth of the matters asserted in the statements), *cert. denied,* —— U.S. ——, 114 S.Ct. 1224, 127 L.Ed.2d 569 (1994).

## C. Substantive Due Process

■Chema next argues that the government's use of cooperating witnesses Guzman and Avila was so outrageous that it violated the Fifth Amendment guarantee that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Specifically, Chema contends that Guzman and Avila "sought to help themselves by snaring individuals that could be charged with drug offenses."

The Supreme Court introduced this type of substantive due process challenge to government conduct in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In that case, the Court noted that it might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1643. The Court clarified *Russell* in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), by explaining that "[t]he limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the *defendant.*" *Id.* at 490, 96 S.Ct. at 1650 (emphasis in original). To rise to the level of a due process violation, the government's conduct must be fundamentally unfair and shocking to the universal sense of justice. *United States v. Cyprian,* 23 F.3d 1189, 1196 (7th Cir.1994); *United States v. Miller,* 891 F.2d 1265, 1267 (7th Cir.1989).

Here, even if Guzman and Avila were motivated by the desire to "help themselves" and "snar[e] individuals that could be charged with drug offenses," their actions do not constitute a violation of the Due Process Clause. Their decision to cooperate with the government and testify at trial against Chema has nothing at all to do with the Due Process Clause. It is the government's conduct that must be fundamentally unfair and shocking to the universal sense of justice, not the actions of private individuals. And, even if by their cooperation they became agents of the government, the cooperation and testimony of Guzman and Avila did not violate any of Chema's rights. The alleged motivation of Guzman and Avila—that they were out to help themselves and snare people like Chema—is irrelevant for purposes of the Due Process Clause. Finally, there clearly is nothing fundamentally unfair or shocking to the universal sense of justice by the government's use of drug-dealers-turned-informants. This is a common, legitimate, and useful practice by law enforcement officials.

### D. Sentence Enhancement for Trial Perjury

██ Chema finally challenges the district court's decision to enhance his sentence for obstruction of justice pursuant to U.S.S.G. § 3C1.1. That Guideline provides: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense by 2 levels." *Id.* Committing perjury is included in the type of conduct to which this enhancement applies. U.S.S.G. § 3C1.1, comment. (n. 3(b)).

Chema testified at trial that he was not Chema, but that he knew somebody else, a man named Roger Rios, who went by the name Chema. Chema's theory was that this was a case of mistaken identity—that the government was prosecuting the wrong person. The district court concluded that Chema lied when he denied that he was Chema and enhanced his sentence. Here, Chema argues that the evidence does not support a finding of trial perjury.

First, the record reveals that five witnesses who testified at trial all identified Chema as Chema. The only contradictory evidence is the testimony of Chema himself, and the district court, which observed his testimony, concluded that he lied. The evidence easily supports a finding of trial perjury.

██ Chema also complains that the district court did not make the required findings to establish perjury. Specifically, he claims that the district court failed to comply with the requirements of *United States v. Dunnigan,* —— U.S. ——, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). In that case, the Court held that "if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same." —— U.S. at ——, 113 S.Ct. at 1117.

The district court in fact made the required findings. When defense counsel objected at sentencing to the government's claim that Chema perjured himself, the court, in rather blunt terms, stated: "Counsel, don't waste your time on that. This court heard the trial. And if it wasn't such a serious situation it would have been laughable, the testimony of your client under oath. And I'm certainly not going to tolerate that in this courtroom under any circumstances." The court added that "this defendant was so flagrant in his testimony and so unbelievable that I could not and will not tolerate that kind of conduct in this court." The court then enhanced his sentence pursuant to U.S.S.G. § 3C1.1.

This finding by the district court satisfies *Dunnigan's* requirements.

### III.

The convictions and sentence of Jose Maria Sanchez or Chema are, in all respects,

AFFIRMED.