**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Larry L. EMERSON, Defendant–**
**Appellant.**

No. 96–3166.

United States Court of Appeals,
Seventh Circuit.

Argued May 19, 1997.

Decided Oct. 20, 1997.

Rodger A. Heaton, Estaban F. Sanchez (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee.

Monroe McWard, Taylorville, IL, Jon G. Noll, Jeffrey T. Page (argued), Springfield, IL, for Defendant–Appellant.

Before RIPPLE, KANNE, and DIANE P. WOOD, Circuit Judges.

KANNE, Circuit Judge.

Larry Emerson, an employee of the United States Postal Service, set up a scheme for hiring contractors to perform work (some real and some phony) on post offices across central Illinois in exchange for kickbacks of money, vehicles, services, and real estate. This plan worked well for awhile, enabling Emerson to swindle more than a quarter of a million dollars from the Postal Service. The postal inspectors eventually discovered the fraud, and a jury convicted Emerson of mail fraud, money laundering, and conspiracy to commit money laundering. The jury also returned a special verdict of forfeiture against the proceeds of Emerson's illegal scheme. The district court subsequently sentenced Emerson to 216 months of imprisonment and three years of supervised release, and it ordered him to pay an $800 special assessment and $349,000 in restitution. On appeal, Emerson claims that the Government failed to present sufficient evidence to convict him of the charged crimes, that the district court improperly applied the sentencing guidelines, and that the district court erroneously refused to offset the value of the forfeited properties against the restitution amount. We reject all but one of Emerson's arguments and therefore remand only for resentencing.

## I. HISTORY.

Larry Emerson worked for the United States Postal Service ("Postal Service"), and in 1989, he became the Manager of Maintenance–Detached Units at the Springfield, Illinois main post office. In this position, Emerson hired independent contractors to perform minor repairs and alterations on associate post offices throughout central Illinois. In doing so, Emerson obtained approval for the repairs from the Postal Service management in Springfield, hired a contractor to perform each job, oversaw the work, and then submitted the contractor's certified invoices to the Postal Service for payment.

In 1993, Emerson gained additional duties as the Contracting Officer's Representative ("COR") for central Illinois. The contracting officer, Robert Rigsby, directed Emerson to obtain bids for formal contracts to perform work on certain post offices in order to make them accessible to handicapped individuals. Although Postal Service policy required competitive bidding for these contracts, Emerson selected John Keller, Wallis Biesenthal, and Johnnie White to perform the jobs without any bidding. As COR, Emerson also had to

monitor the performance of the contractors and inspect the work sites. If the work conformed to the formal contracts, Emerson was to certify that the work had been performed and submit the contractors' invoices to the Postal Service for payment.

In late 1991 or 1992, Emerson began defrauding the Postal Service with the help of Biesenthal, Keller, and other contractors. The contractors would submit false or inflated construction invoices with Emerson's approval, and then they would provide kickbacks to Emerson in the form of cash, cars, trucks, construction equipment, building supplies, and free construction services on property owned by Emerson. Emerson submitted invoices for work he knew the contractors never performed, yet he certified to the Postal Service that the bills were correct. In 1993 and 1994, Emerson received over $350,000 in kickbacks from Biesenthal, Keller, and other unindicted contractors.

On several occasions, Emerson enlisted other contractors to do the work that Biesenthal and Keller were paid to do, and then Emerson would submit additional invoices to the Postal Service for the work actually performed by these other contractors. Under this scheme, the Postal Service would pay twice for the same work—i.e., Emerson would submit one invoice for the work performed under a formal contract and another invoice under the pretext that the job constituted minor repair work.

Emerson, Biesenthal, and Keller took additional action to conceal and to further their fraudulent scheme. For example, Emerson directed them to operate under different business names to avoid the appearance that a single contractor received too much work; he suggested that Keller's girlfriend act as an officer of a construction company to create the impression that he awarded a contract to a minority-run business; he instructed them to submit invoices below his $2,000 spending limit; and he asked them not to include work dates or locations on the invoices. In addition, Emerson either conducted or directed Biesenthal and Keller to perform certain financial transactions involving the proceeds of the mail fraud scheme. In

particular, Emerson had Biesenthal maintain a separate bank account for the kickbacks; he directed Biesenthal and Keller to purchase goods for him and make payments on his rental property loans; and he enlisted contractors to perform work and purchase supplies for his various homes free of charge.

The Government discovered Emerson's schemes and charged him in a seventeen-count indictment with ten counts of mail fraud in violation of 18 U.S.C. § 1341, five counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), and one count of criminal forfeiture under 18 U.S.C. § 982(b)(1). A jury convicted him of all the charges, and the district court sentenced him to 216 months imprisonment, three years supervised release, an $800 special assessment, and $349,000 in restitution. The jury also found that several pieces of Emerson's real and personal property were proceeds of Emerson's illegal schemes, and the court ordered the forfeiture of that property.

## II. ANALYSIS

### A. Sufficiency of the Evidence

■ Emerson first complains that the Government failed to present sufficient evidence from which a rational jury could determine that he committed the charged crimes. A defendant bears a heavy burden in challenging the sufficiency of the evidence after a conviction. *See United States v. Hickok*, 77 F.3d 992, 1002 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996). We review all the evidence in the light most favorable to the Government, draw all reasonable inferences in the Government's favor, and reverse "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt," *United States v. Thompson*, 106 F.3d 794, 798–99 (7th Cir.1997) (quoting *United States v. Gutierrez*, 978 F.2d 1463, 1468–69 (7th Cir. 1992)).

■ Emerson cannot meet this heavy burden. To prove mail fraud, the Government needed to establish Emerson's participation

in a scheme to defraud, his intent to defraud, and use of the mails to further that scheme. *See United States v. Strang,* 80 F.3d 1214, 1219 (7th Cir.1996); *see also* 18 U.S.C. § 1341. Emerson complains that the Government did not prove his knowing participation in a scheme to defraud the Postal Service, and he maintains that Biesenthal's and Keller's testimony to the contrary is unworthy of belief.

■ We reverse a conviction based on the incredulity of testimony only if that testimony is incredible as a matter of law. *See United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989). To meet this standard, the testimony must be unbelievable on its face, physically impossible for the witness to observe, or contrary to the laws of nature. *See id.* Moreover, we do not assess the credibility of witnesses even where the testimony is "totally uncorroborated and came from an admitted liar, convicted felon, large-scale drug-dealing, paid government informant." *United States v. Davis,* 15 F.3d 1393, 1398 (7th Cir.1994) (quoting *United States v. Beverly,* 913 F.2d 337, 358 (7th Cir.1990) and *United States v. Molinaro,* 877 F.2d 1341, 1347 (7th Cir.1989)). In this case, we find nothing suspect in Biesenthal's and Keller's testimony, let alone anything that would warrant a reversal. In addition, the Government provided a mountain of evidence, including photographs, checks, and postal service forms, to corroborate Biesenthal's and Keller's testimony implicating Emerson in the mail fraud scheme.

■ Emerson's additional arguments are also without consequence. The fact that Emerson may not have had final approval authority on the disbursement of Postal Service monies does not diminish his participation in a scheme to defraud the Postal Service out of that money. Finally, we reject Emerson's argument that his conduct amounted to mere negligent business practice. Emerson maintained that his abundant workload prevented him from adequately monitoring construction projects and thus permitted Biesenthal and Keller to charge the Postal Service for work that they did not perform. Emerson's co-conspirators testified, however, that Emerson not only willingly participated in the scheme, but that he also created and controlled that scheme. Relying on this evidence, the jury reasonably concluded that Emerson committed mail fraud.

■ To prove money laundering, the Government needed to show that Emerson conducted a financial transaction affecting interstate commerce with property representing the proceeds from some illegal activity, that he knew the property represented illegal proceeds, and that he conducted the transaction with the intent of promoting the unlawful activity. *See* 18 U.S.C. § 1956(a)(1)(A)(i); *see also United States v. Montague,* 29 F.3d 317, 321 (7th Cir.1994). Emerson first challenges the existence of the unlawful activity—*i.e.,* the mail fraud—but as detailed above, the Government produced sufficient evidence of mail fraud at trial. Contrary to Emerson's assertions, moreover, the Government also presented ample evidence linking Emerson's purchases of personal and real property with the proceeds from the mail fraud. Biesenthal and Keller both testified that Emerson gave them instructions about how to structure certain financial transactions that would help Emerson benefit from the fraud, and Emerson's tax returns demonstrated the unlikelihood of Emerson's numerous purchases in light of his earnings. Finally, the jury could reasonably accept the Government's version of how Emerson acquired the funds he put into the properties rather than Emerson's argument that he secretly accumulated the funds from other sources over several years.

■ The Government similarly provided sufficient evidence of Emerson's participation in a conspiracy to launder money. A conspiracy involves a combination of two or more people formed for the purpose of carrying out some criminal act. *See United States v. Rodriguez,* 53 F.3d 1439, 1444 (7th Cir. 1995). To prove this conspiracy, the Government needed to show that there was an agreement between two or more people to launder money, that Emerson was a party to the agreement, and that one of the conspirators committed an overt act in furtherance of the agreement. *See id.* at 1445; *see also United States v. Santos,* 20 F.3d 280, 283

(7th Cir.1994). Biesenthal and Keller again provided substantial evidence inculpating Emerson on the conspiracy charge as they testified about their agreements with Emerson to engage in certain financial transactions to hide the kickbacks, as well as their actions and Emerson's actions towards that end. The jury therefore could reasonably determine that Emerson conspired to launder money.

### B. Sentencing

■ Emerson next raises several challenges to his sentence. We review a sentencing court's factual determinations for clear error and its interpretations of the guidelines de novo. See United States v. Owolabi, 69 F.3d 156, 162 (7th Cir.1995), cert. denied, —— U.S. ——, 116 S.Ct. 959, 133 L.Ed.2d 882 (1996).

#### 1. Aggravating Role in the Offense

■ Emerson first complains that the district court erred by enhancing his base offense four levels because he was an organizer or leader in the offenses. Section 3B1.1(a) of the United States Sentencing Guidelines provides that a defendant's offense level should be increased by four points "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S. Sentencing Guidelines Manual ("USSG") § 3B1.1(a) (1995). In determining whether a defendant is an organizer or leader, courts consider a defendant's exercise of decision making authority, the nature of his participation in committing the crime, his recruitment of accomplices, his claimed right to a larger share of the criminal proceeds, his exercise of control and authority over others, and the nature and scope of the illegal activity. See USSG § 3B1.1, comment. (n.4). Not all of these factors need be present, however, for a court to enhance a sentence under § 3B1.1. See United States v. Akinrinade, 61 F.3d 1279, 1289 (7th Cir.), cert. denied, —— U.S. ——, 116 S.Ct. 541; 133 L.Ed.2d 444 (1995).

We find that the district court properly applied this enhancement. Contrary to Emerson's assertions, the evidence amply demonstrated that Emerson exercised control over a scheme involving five or more people. For example, Keller and Biesenthal both testified that Emerson not only recruited them into the kickback scheme, but that Emerson also directed their actions in performing the repair jobs and filling out the fraudulent invoices. The evidence also demonstrated that Emerson led at least two other contractors—John White and Kevin Wilson—as participants in the kickback scheme. Both White and Wilson testified that they performed Postal Service work, that Emerson asked them to service Emerson's personal properties, and that they did not collect any fees from Emerson for their work on his private properties. This evidence of Emerson directing the activities of the participants in the kickback scheme also refutes Emerson's assertion that he never led the participants in the scheme but only managed the various properties or assets involved. Finally, even if we accepted Emerson's assertion that White and Wilson were not part of the scheme, we would agree with the district court that the kickback scheme was "otherwise extensive." For these reasons, the district court did not err in enhancing Emerson's sentence by four levels due to his leadership role in the offenses.

#### 2. Abuse of Position of Trust

■ Emerson next argues that the district court improperly enhanced his base offense by two levels pursuant to USSG § 3B1.3 because he abused a position of public or private trust. To determine whether to apply this enhancement, a court must determine "1) whether the defendant occupied a position of trust; and 2) whether his abuse of the position of trust significantly facilitated the crime." United States v. Brown, 47 F.3d 198, 205 (7th Cir.1995).

We agree with the district court that Emerson occupied a position of trust because he had authority over "valuable things," see United States v. Boyle, 10 F.3d 485, 489 (7th Cir.1993), namely awarding repair jobs and formal construction contracts on post offices throughout central Illinois, inspecting the work sites, and certifying the completion of work performed (or not performed). The

mere fact that the Postal Service did not authorize Emerson to approve the payments of any invoices does not alter the fact that the Postal Service entrusted him with the important duties of selecting contractors and certifying the completion of their work. Moreover, Emerson's abuse of this trust obviously facilitated the crime because a crucial element of the scheme involved Emerson's awarding of contracts and repair jobs to those contractors who would provide him with kickbacks. The district court therefore correctly determined that Emerson abused this position of trust.

### 3. Obstruction of Justice

Emerson also argues that the district court should not have imposed a two-level enhancement pursuant to USSG § 3C1.1 because he did not willfully or materially obstruct justice. The court found that Emerson willfully obstructed justice within the meaning of § 3C1.1 because he gave false statements to postal inspectors, attempted to fabricate a common story and influence witnesses, and provided perjured testimony. *See* USSG § 3C1.1 comment. (n.3(a) (attempting to influence a witness), (b) (committing perjury) & (g) (providing materially false information to law enforcement officers that significantly impedes the investigation or prosecution)). We agree with the sentencing court's assessment of the evidence.

First, Emerson willfully provided materially false statements to the postal inspectors who were investigating him. Specifically, Emerson lied by telling the inspectors that he personally inspected all post offices to ensure that contract work was performed and to certify the invoices for payment; that he paid the contractors for work they performed on Emerson's personal properties; and that he purchased various properties from savings accumulated over the years rather than from the kickbacks received from his cohorts. Second, Emerson contacted Biesenthal on at least two occasions in order to concoct a common story regarding their meetings and their financial dealings. Emerson also tried to persuade Kevin Wilson to testify that Wilson performed work for Emerson but inadvertently forgot to send Emer-

son a bill. Wilson, however, testified that he never sent Emerson a bill because he wanted Emerson to consider him for future Postal Service contract work.

Third, Emerson committed perjury while testifying at trial. Emerson correctly notes that § 3C1.1 is not intended to punish a defendant for exercising his right to testify, but the guideline does punish those who commit perjury when denying their guilt. *See United States v. Dunnigan*, 507 U.S. 87, 96, 113 S.Ct. 1111, 1117–18, 122 L.Ed.2d 445 (1993); *see also* USSG § 3C1.1, comment. (n.1). A district court must make an independent finding of perjury when a defendant objects to a sentence enhancement based on obstruction of justice via perjury. *See Dunnigan*, 507 U.S. at 95, 113 S.Ct. at 1116–17. In this case, the district court made this finding and determined that Emerson willingly provided false testimony regarding material matters on numerous occasions. For example, Emerson testified that he gave loans to Biesenthal and Keller so that they could pay their workers, but Biesenthal and Keller refuted this testimony. This falsehood, as well as the other lies told by Emerson at trial, intended to convince the jury that Emerson did not engage in the kickback scheme and that he did not purchase personal items and property with the proceeds from the scheme. Without question, Emerson's false testimony went "to the very heart of the case," *United States v. Rodriguez*, 995 F.2d 776, 779 (7th Cir.1993), and was therefore material. The district court went so far as to note that Emerson's "testimony was so unbelievable that not even he could believe that his version of the events were true." *United States v. Emerson*, No. 95–30006, slip op. at 10 (N.D.Ill. Aug. 28, 1996); *see United States v. Sanchez*, 32 F.3d 1002, 1006 (7th Cir.1994). Based on this evidence, we find no error in the district court's finding that Emerson perjured himself at trial or in its decision to enhance Emerson's base offense level.

### 4. Reckless Endangerment During Flight

Emerson further complains that the district court should not have enhanced his base offense level by two points pursuant to USSG § 3C1.2. That guideline provides for

an enhancement "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." USSG § 3C1.2. Emerson challenges the factual findings of the sentencing court by maintaining that he did not endanger any persons or property when fleeing from law enforcement officers on July 27, 1994. The evidence at trial and sentencing, however, shows otherwise.

Contrary to Emerson's bald assertion that he drove away from the postal inspectors "at a low rate of speed," the evidence provided by two agents, one co-conspirator (Biesenthal), and audio and videotape surveillance proves Emerson wrong. Emerson fled the postal inspectors driving through residential areas on a rainy day reaching speeds of 60 mph, failing to stop at a stop sign, passing other vehicles, and forcing at least one vehicle to stop in order to avoid an accident. Such reckless conduct plainly warrants an enhancement under § 3C1.2. See United States v. Velasquez, 67 F.3d 650, 654–55 (7th Cir.1995) (driving at a high rate of speed through residential neighborhoods warrants reckless endangerment enhancement); United States v. Chandler, 12 F.3d 1427, 1433 (7th Cir.1994) (affirming enhancement of defendant who drove thirty-five to fifty miles per hour through residential subdivisions at dusk at high speeds while swerving from lane to lane to prevent police officers from passing him).

### 5. Grouping of Multiple Counts

█ In his final sentencing objection, Emerson complains that the district court incorrectly employed USSG § 3D1.4 to determine his combined offense level. The court refused to group the mail fraud and money laundering convictions as closely related counts under § 3D1.2, instead applying § 3D1.4, which resulted in a one-level enhancement.

Section 3D1.2 provides that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group."

USSG § 3D1.2. This condition is met when 1) the counts involve the same victim and the same act or transaction; 2) the counts involve the same victim and two or more acts or transactions that constitute a common criminal objective, scheme, or plan; 3) one of the counts includes conduct accounted for as a specific offense characteristic or another adjustment to the guideline applicable to the other count; or 4) the base offense level is determined largely on the total amount of loss, quantity of substance involved, some other aggregate harm, or the offense behavior's continuing nature is otherwise considered in the offense guideline. See USSG § 3D1.2.

Emerson argues that our recent decision in United States v. Wilson, 98 F.3d 281 (7th Cir.1996), requires the grouping of his mail fraud and money laundering convictions as closely-related counts under § 3D1.2. The defendant in Wilson operated a Ponzi scheme and was subsequently convicted of mail fraud and money laundering. We held that the district court erred in refusing to group the mail fraud and money laundering charges as closely-related counts under § 3D1.2 noting that "[w]ithout the fraud there would have been no funds to launder." Id. at 282–83 (quoting United States v. Mullens, 65 F.3d 1560, 1564 (11th Cir.1995), cert. denied, — U.S. —, 116 S.Ct. 1337, 134 L.Ed.2d 487 (1996)). More importantly, however, we found that the counts must be grouped under § 3D1.2 because the money laundering served the necessary purpose of concealing the fraud, keeping the scheme afloat, and perpetuating the scheme that produced the laundered funds. Id. at 283–84. We additionally reasoned that USSG § 3D1.2(d) provided that offenses governed by § 2F1.1 and § 2S1.1 are appropriate for grouping because the "offense level is determined largely on the basis of the total amount of harm or loss," USSG § 3D1.2(d). Wilson, 98 F.3d at 283; see also United States v. Coscarelli, 105 F.3d 984, 989 (5th Cir.), reh'g en banc granted, 111 F.3d 376 (5th Cir.1997).[1]

---

1. There is some question whether all of the offense sections listed under § 3D1.2(d) are to be grouped with each other, or if only those sections listed in the same row are to be grouped together. The offense guidelines at issue in Wilson— § 2F1.1 and § 2S1.1—are both listed under

The Government argues that the mail fraud and money laundering convictions should not be grouped as closely-related counts because the mail fraud and money laundering involved different transactions and different victims. *See* USSG § 3D1.2(a); *United States v. Kunzman*, 54 F.3d 1522, 1531 (10th Cir.1995) (refusing to group mail fraud and money laundering as closely related counts because the mail fraud victimized the person defrauded and the money laundering victimized society at large); *United States v. Johnson*, 971 F.2d 562, 576 (10th Cir.1992) (same). According to the Government, the mail fraud involved Emerson's scheme to swindle money out of the Postal Service by awarding construction projects to selected contractors, letting those contractors submit fraudulent bills, and accepting kickbacks in return for giving the contractors the Postal Service work. The Government maintains that the money laundering, on the other hand, involved Emerson's maneuvers to hide his illegal proceeds, and thereby promoted his criminality, through the conversion of large sums of cash to personal and real property. The money laundering, moreover, commenced after the completion of the mail fraud, and Emerson's mail fraud schemes would have been successful even if the money laundering had never occurred. The Government thus argues that *Wilson* is distinguishable because the mail fraud and money laundering in *Wilson* were "integral cogs in continuing the scheme," while Emerson's money laundering was not *necessary* to perpetuate the mail fraud.

While we see the point in much of the Government's argument, we cannot overlook the fact that Emerson was indicted and convicted under the "promotion" prong of the money laundering statute. *See* 18 U.S.C. § 1956(a)(1)(A)(i). *See generally* Jimmy Gurule, *The Money Laundering Control Act of 1986: Creating a New Federal Offense or Merely Affording Federal Prosecutors an Alternative Means of Punishing Specified Unlawful Activity?*, 32 Am.Crim.L.Rev. 823 (1995) (discussing the differences between the "promotion" and "concealment" prongs of 18 U.S.C. § 1956). In other words, the evidence at trial demonstrated that Emerson laundered the proceeds of his mail fraud scheme with the intent of promoting that illegal scheme. In *Wilson*, we found mail fraud and money laundering counts to be closely related where the defendant pled guilty to violating the "concealment" prong of the money laundering statute, *see* 18 U.S.C. § 1956(a)(1)(B)(i),[2] and merely concealing the proceeds of criminal activity evidences a lesser connection to the underlying criminality than actually promoting or "plowing back" the proceeds into that criminal scheme, *see United States v. Jackson*, 935 F.2d 832, 841–42 (7th Cir.1991).[3]

Furthermore, in *Wilson* we rejected the notion that mail fraud and money laundering

§ 3D1.2(d), but they are not listed in the same row. In *Wilson*, we found that even if the grouping of those two sections was not automatic because of their listing under § 3D1.2(d), *see United States v. Harper*, 972 F.2d 321, 322 (11th Cir.1992) (per curiam), the mail fraud and money laundering counts were of the "same general type and ... criteria" otherwise grouped under § 3D1.2(d), *see* USSG § 3D1.2, comment. (n.6). *Wilson*, 98 F.3d at 283.

As in *Wilson*, the offense guidelines in this case—§ 2C1.7 (with its cross-references to § 2C1.2 and § 2F1.1) and § 2S1.1—are all listed under § 3D1.2(d), but they are not listed in the same row.

2. In *Wilson* we did note, however, that although Wilson pled guilty only to laundering money with the intent of concealing the mail fraud, *see* § 1956(a)(1)(B)(i), the indictment that was dismissed upon the entry of Wilson's guilty plea also charged him with laundering money with the intent of promoting the carrying on of his fraud,

*see* § 1956(a)(1)(A)(i). *Wilson*, 98 F.3d at 283 n. 2.

3. The district court cited *United States v. Lombardi*, 5 F.3d 568 (1st Cir.1993), for the proposition that mail fraud and money laundering charges need not be grouped under § 3D1.2 as closely related counts. *Lombardi*, however, is inapposite. *Lombardi* used the term "money laundering" to refer to a violation of 18 U.S.C. § 1957, which criminalizes the conduct of knowingly engaging "in a monetary transaction involving criminally derived property of a value greater than $10,000 where the property resulted from ... mail fraud." *Lombardi*, 5 F.3d at 569. That case specifically noted, however, that 18 U.S.C. § 1956 represents a separate federal offense that involves "more demanding requirements and greater penalties." *Id.* at 569 n. 1. The "more demanding requirements" in our case involve the element of Emerson's intent to promote his illegal activity via the money laundering.

should not be grouped as closely related because those crimes harm different victims. Specifically, we stated that "there is intuitive force to the argument that the victim of the fraud is also a victim of the transaction designed to hide or 'cleanse' the funds of which she was defrauded." *Wilson*, 98 F.3d at 283; *see also United States v. Leonard*, 61 F.3d 1181, 1185–86 (5th Cir.1995).

Although Emerson completed his mail fraud before he ever laundered the illegal proceeds, and even though the *viability* of Emerson's mail fraud scheme may not have relied upon the money laundering, Emerson embarked upon his money laundering scheme with the intent of promoting his mail fraud swindle. This factor brings Emerson's case clearly within the realm of *Wilson*, and therefore requires us to remand the case for resentencing.

### C. Restitution and Forfeiture

▮▮▮ Emerson finally complains that the district court erred in refusing to offset the amount of restitution against the value of the forfeited property. We review a district court's order for restitution for abuse of discretion, and we will disturb that order only if the sentencing court exercised its discretion using inappropriate factors or by failing to use any discretion at all. *See United States v. Boyle*, 10 F.3d 485, 490 (7th Cir.1993).

After finding Emerson guilty of mail fraud, money laundering, and conspiracy to commit money laundering, the jury returned a special verdict for the forfeiture of several properties—including cars, trucks, tractors, and homes—that were proceeds of Emerson's illegal conduct. The district court also entered an order of restitution that required Emerson to pay $349,000 ($144,550 of which Emerson jointly and severally owned with John Keller, a co-conspirator) to the Postal Service. The district court subsequently rejected Emerson's request for a setoff against that restitution amount with the monies received through liquidation of the forfeited properties.

▮▮▮ The U.S.Code provides that a sentencing court "shall order" forfeiture of any property involved in a money laundering offense under 18 U.S.C. § 1956. *See* 18 U.S.C. § 982(a)(1). Because Emerson was convicted for violating 18 U.S.C. § 1956, the plain language of the forfeiture statute *required* the district court to order the forfeiture of Emerson's ill-gotten property. The U.S.Code also permits a sentencing court to make restitution to the victims of a crime in addition to imposing any authorized penalty or punishment. *See* 18 U.S.C. § 3663(a)(1). A district court has wide discretion in determining the appropriateness and amount of restitution. *See United States v. Ross*, 77 F.3d 1525, 1552 (7th Cir.1996).[4] In this case, Emerson defrauded the Postal Service out of the stipulated amount of $349,000, and the district court therefore ordered restitution of that amount. Neither of these statutes, however, discusses whether a district court can reduce the amount of restitution by the value of the forfeited property.

Emerson makes two arguments why the district court should have ordered such a setoff. First, he claims that the forfeiture and restitution constituted double punishment and that the Government received a windfall through this double payment. Second, Emerson maintains that he and his family lack the resources to cover the restitution amount thus preventing the Postal Service from recovering the full amount of its loss. We believe that the district court did not abuse its broad discretion in rejecting these two arguments and refusing Emerson's setoff request.

We find no compelling precedent suggesting that the district court could not order both restitution and forfeiture. As detailed above, the relevant statutes do not address the appropriateness or inappropriateness of ordering both forfeiture and restitution. In a related context, however, the Third Circuit rejected a defendant's double jeopardy challenge to a civil forfeiture proceeding that commenced after a restitution order. *See*

---

4. In exercising this discretion, a sentencing court considers: (1) the amount of the victim's loss, (2) the defendant's financial resources, (3) the financial needs of the defendant and his dependents, (4) the financial earning ability of the defendant and his dependents, and (5) any other factors the court deems appropriate. *See Ross*, 77 F.3d at 1552.

*United States v. Various Computers and Computer Equipment,* 82 F.3d 582 (3d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 406, 136 L.Ed.2d 320 (1996). In *Various Computers,* the defendant was convicted of credit card fraud, and he was ordered to pay restitution for the value of several pieces of fraudulently-obtained computer equipment. *See id.* at 584. In a later, separate civil forfeiture proceeding, the Government sought forfeiture of the illegally-obtained computer equipment. *See id.* The district court ordered the forfeiture, and the appellate court rejected the defendant's claim that the forfeiture violated his Fifth Amendment right against multiple punishment. *See id.* at 586–89. The Third Circuit reasoned that

> paying restitution plus forfeiture at worst forces the offender to disgorge a total amount equal to twice the value of the proceeds of the crime. Given the many tangible and intangible costs of criminal activity, this is in no way disproportionate to "the harm inflicted upon government and society by the [offense]." ... [P]ayment of restitution in no way alters the status of the property as ill-gotten gains. Restitution operates to make the victim of the crime whole, not to confer legal ownership on the offender of the stolen property. As a result, [the defendant's] payment of restitution prior to forfeiture makes no difference in our double jeopardy analysis.

*Id.* at 588 (citation omitted). In another case, the Ninth Circuit held that a court did not impose cruel and unusual punishment in violation of the Eighth Amendment by issuing a restitution order for an amount equal to that of the forfeiture order. *See United States v. Feldman,* 853 F.2d 648, 663–64 (9th Cir.1988). In doing so, the court noted that a district court does not lose its discretion to

impose a sentence of restitution merely "because a defendant must also forfeit the proceeds of illegal activity." *Id.* at 663. Indeed, our own case law has permitted, without discussion, sentencing orders that include both forfeiture and restitution. *See, e.g., United States v. Wolf,* 90 F.3d 191 (7th Cir. 1996); *United States v. Randy,* 81 F.3d 65 (7th Cir.1996).[5]

Emerson points out that at least one court has credited the amount of a defendant's forfeiture towards the restitution amount. *See United States v. Barnette,* 902 F.Supp. 1522, 1531 (M.D.Fla.1995). *Barnette,* however, provided no analysis of its decision to order the setoff discussing neither the statutes involved nor the policies underlying restitution and forfeiture. Moreover, the liquidation of the forfeited stocks in *Barnette* produced an amount that sufficiently reimbursed the victim of the crime and left over four million dollars for forfeiture. The liquidation of Emerson's forfeited property, in contrast, might not compensate the Postal Service for its entire loss.

Furthermore, we find unpersuasive Emerson's unsupported assertion that the Government would receive a windfall through the payment of both restitution and forfeiture. The Postal Service is the direct victim in this case and it deserves to be made whole via restitution. Forfeiture, on the other hand, seeks to punish a defendant for his ill-gotten gains by transferring those gains from the defendant to the United States Department of Justice ("DOJ"). Contrary to Emerson's contentions, the Postal Service is an entity distinct from the DOJ, given that the Postal Service is "an independent establishment of the executive branch," *see* 39 U.S.C. § 101 *et seq.,* and the DOJ is an "executive depart-

---

5. Along those lines, we note that once the Government wins a judgment of forfeiture, the relation-back doctrine provides that the right, title, and interest in the forfeited property vests in the United States at the time the defendant committed the offense that gives rise to the forfeiture. *See* 18 U.S.C. § 982 (incorporating by reference the relation-back doctrine of 21 U.S.C. § 853(c)). *See generally United States v. 92 Buena Vista Ave.,* 507 U.S. 111, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993). One could therefore argue that the district court could not offset the restitution amount by the forfeiture amount because Emerson did

not have legal title to the forfeited properties once he committed the crimes. *Cf. 92 Buena Vista Ave.,* 507 U.S. at 127, 113 S.Ct. at 1136 (noting that even though the vesting of title pursuant to forfeiture relates back to the commission of the crime, the government does not own the property until it wins the forfeiture judgment). We need not ground our judgment on this theory, however, because we find nothing in the statutes or the case law that prevent a district court from using its discretion to order both forfeiture and restitution.

ment," *see* 28 U.S.C. § 501 *et seq.* *See* U.S. Government Manual 324, 738 (1995).[6]

Finally, we find that the district court did not abuse its discretion in rejecting Emerson's argument that his alleged indigency would prevent the Postal Service from receiving the restitution amount. *See Ross*, 77 F.3d at 1552 ("[A]lthough the sentencing court is required to consider the defendant's indigence, this one factor is not solely determinative of whether restitution is appropriate."). First, $144,550 of the restitution amount is owned jointly and severally by Emerson and his co-conspirator Keller. Keller can therefore provide nearly half of the relief. Second, Emerson, whose talents are exhibited by his rise through the ranks of the Postal Service, does have the capability of earning income in the future. *See Boyle*, 10 F.3d at 492 (noting that the sentencing court "permissibly concluded that [the defendant's] 'great zeal' in operating businesses and engaging in substantial financial transactions would enable him to one day earn a significant income"). We therefore agree with the district court that this case does not present a situation warranting a setoff of the restitution amount by the forfeiture amount.

Emerson's conviction is AFFIRMED, and his sentence is VACATED. We REMAND to the district court for resentencing on the grouping issue in light of our decision in *Wilson*.

---

**6.** Our review of various statutes suggests that the proceeds of Emerson's forfeited assets will remain with the DOJ, but we hesitate to rely too heavily on this conclusion given the failure of either party to detail the disbursement of the proceeds and the general convoluted nature of the statutes involved. A statute involving the Department of Justice Assets Forfeiture Fund (the "DOJ Fund") provides that "all amounts from the forfeiture of property under any law enforced or administered by the Department of Justice" shall be deposited into the DOJ Fund "except all proceeds of forfeitures available for use by . . . the Postmaster General of the United States pursuant to 39 U.S.C. § 2003(b)(7)." *See* 28 U.S.C. § 524(c)(4)(A). This section seems to suggest that the Postal Service might receive at least some proceeds from the forfeited assets. Section 2003(b)(7) provides, however, that "amounts (including proceeds from the sale of forfeited items) from any civil forfeiture conducted by the Postal Service" shall be deposited into the Postal Service Fund. *See* 39 U.S.C. § 2003(b)(7) (emphasis added). Because this case involves criminal rather than civil forfeiture, the forfeited assets arguably remain in the DOJ Fund.